**IN THE UNITED STATES DISTRICT COURT
FOR THE EASTERN DISTRICT OF PENNSYLVANIA**

| | |
|---|---|
| IN RE GLUCAGON-LIKE PEPTIDE-1 RECEPTOR AGONISTS (GLP-1 RAS) NON-ARTERITIC ISCHEMIC OPTIC NEUROPATHY PRODUCTS LIABILITY LITIGATION | MDL NO. 3163<br><br>THIS DOCUMENT RELATES TO ALL CASES<br><br>JUDGE KAREN SPENCER MARSTON |
| JAMES BROWNING,<br>　　　　　　Plaintiff,<br>v.<br><br>ELI LILLY AND COMPANY and LILLY USA, LLC,<br>　　　　　　Defendants. | COMPLAINT AND JURY DEMAND<br><br>CIVIL ACTION NO.: _____ |

-------------------------------------------------------------------------------------------------------

**COMPLAINT AND DEMAND FOR JURY TRIAL**

Plaintiff files this Complaint pursuant to the Direct Filing Order and is to be bound by the rights, protections and privileges, and obligations of that Direct Filing Order and other Orders of the Court. Further, in accordance with the Direct Filing Order, Plaintiff hereby designates the United States District Court for the Northern District of West Virginia as Plaintiff's designated venue ("Original Venue"). Plaintiff makes this selection based upon one (or more) of the following factors (check the appropriate box(es)):

X  Plaintiff currently resides in Parson, WV (City/State).

X  Plaintiff purchased and used Defendant(s)' products in Parson, WV (City/State).

__ The Original Venue is a judicial district in which Defendant _____ resides, and all Defendants are residents of the State in which the district is located (28 USC § 1391(b)(1)).

X The Original Venue is a judicial district in which a substantial part of the events or omissions giving rise to the claim occurred, specifically (28 USC § 1391(b)(2)):
Plaintiff purchased and used Defendant(s) products in Parson, WV _____

1

__ There is no district in which an action may otherwise be brought under 28 USC § 1391, and the Original Venue is a judicial district in which Defendant _____ is subject to the Court's personal jurisdiction with respect to this action (28 USC § 1391(b)(3)).

__ Other (please explain): _____.

Plaintiff, James Browning, by Plaintiff's attorney, Parvin Aminolroaya of Seeger Weiss, LLP, hereby brings this action against Defendants ELI LILLY AND COMPANY and LILLY USA, LLC (hereinafter "Defendants" or "Lilly"). Upon information and belief, at all times hereinafter mentioned, Plaintiff alleges as follows:

## JURISDICTION AND VENUE

1.      This Court has jurisdiction over this action pursuant to 28 U.S.C. § 1332, because the amount in controversy as to Plaintiff exceeds $75,000.00, exclusive of interest and costs, and because Defendants are incorporated and have their principal places of business in states other than the state in which Plaintiff resides, which is West Virginia.

2.      This Court has personal jurisdiction over all Defendants, consistent with the United States Constitution and West Virginia Code § 56-3-33 (West Virginia's "long arm" statute) by virtue of Defendants' substantial, continuous, and systematic contacts with the State of West Virginia.

## INTRODUCTION

3.      Vision is the most dominant of the senses, and plays a critical role in every facet and stage of our lives. Without vision, a person will struggle to learn, walk, read and work.

4.      Vision loss can lead to worsened mental health, loss of or limited employment, social isolation, and the need for a caregiver.

5.      Non-arteritic Anterior Ischemic Optic Neuropathy ("NAION") is an irreversible condition that causes sudden and permanent vision loss.

2

6.  Vision loss with NAION is untreatable and can result in permanent blindness. [1]

7.  Vision loss with NAION is sudden, and usually discovered when a person wakes up in the morning and notices a loss of their vision in one eye.

8.  Patients with NAION suffer from blurred or darkened vision obstructing their field of view, as well as loss of color vision and loss of contrast in vision.[2]

9.  About 15% of patients who have NAION in one eye eventually develop it in their other eye too. [3]

10.  For most patients with NAION, the vision loss *will not improve with time*. Some will experience progressive worsening of their vision after the initial vision loss.[4]

11.  This is an action for damages suffered by Plaintiff, James Browning, who was severely injured, by developing NAION as a result of Plaintiff's use of Trulicity, an injectable prescription medication that is used to control blood sugar in adults with type 2 diabetes.

12.  The active ingredient in Trulicity is dulaglutide.  Dulaglutide works by targeting the body's receptors for GIP (glucose-dependent insulinotropic polypeptide) and GLP-1 (glucagon-like peptide-1).

13.  Trulicity (dulaglutide) belongs to a class of drugs called GLP-1 receptor agonists ("GLP-1RAs"). GLP-1 RAs are prescribed, for certain patient populations, to treat type 2 diabetes, aid in chronic weight management, and reduce cardiac risk.

14.  Defendants knew, or should have known, based on preclinical trials, premarket

---

[1] *Ischemic Optic Neuropathy*, Cleveland Clinic, (last reviewed 6/30/2024), available at https://my.clevelandclinic.org/health/diseases/ischemic-optic-neuropathy (last visited 12/17/2024).

[2] *Id.*

[3] *Id.*

[4] *Id.*

clinical trials, post-market surveillance, and adverse event reports of NAION injuries with Trulicity or GLP-1RA drugs, that there was reasonable evidence of a causal association between the use of Trulicity and NAION.

15.    Despite this, Defendants failed to warn about the risk of NAION with Trulicity.

16.    Instead, Defendants created and expanded the market for weight-loss medication by, among other things, by spending hundreds of millions of dollars on marketing to doctors and patients,  advocating for obesity to be classified as a disease and thereby expanding the market for their drugs, change the medical consensus on how to treat that disease, implementing cutting-edge invasive, unprecedented and multifaceted marketing campaigns that were so effective they ingrained these drugs in the pop culture zeitgeist, and spending untold millions in an effort to get weight-loss medications covered under public and private insurance. Defendants engaged in this conduct even before GLP-1 RAs were approved for weight-loss, encouraging extensive off-label demand and use.

17.    Defendants' intentionally targeted the American population for the sale of their weight-loss drugs. Defendants understood the vast financial potential of marketing a weight-loss medication in the United States where obesity rates were on the rise despite the culture's obsession with losing weight and being thin.

18.    By undertaking that effort, Defendants also were systematically and intentionally targeting users of other diabetes medications. Defendants' promise of weight loss wrongfully enticed users of other diabetes medications to switch to a GLP-1 RA, such as Trulicity, who never would have done so had it not been for the off-label promotion of those drugs.

19.    Defendants also sought to make the GLP-1 RAs, including Trulicity more accessible by, among other things, marketing through telemedicine where the criteria for

qualifying for the drugs, *e.g.*, Body Mass Index ("BMI"), are more easily manipulated.

20. Defendants' efforts to conceal (or minimize) the risks associated with taking their drugs, including the risk of developing NAION were intended to create the impression that these were "magic pills" to help a person lose weight. However, Defendants never disclosed that many people who take these drugs stop taking them because of the drastic side effects (thereby never achieving weight loss or any health benefit allegedly associated with the drug); the drugs do not result in meaningful weight loss for up to 15% of people;[5] the average weight loss for someone taking the drugs is a modest 10.09% of the person's body weight;[6] and that a person will need to stay on these drugs for the rest of their lives to maintain the weight loss.[7] What is worse is that Defendants kept this information hidden while actively degrading trust in the prevailing view that lifestyle changes like proper nutrition and exercise were the keys to health and can accomplish long-lasting weight-loss and management for most people.

21. The efforts to ingrain GLP-1 RAs in the public conscious, to manipulate the medical community's views on obesity treatment, and to make the drugs more accessible acted as a launching pad for the explosive growth of the GLP-1 RAs both for people who were diabetics, and for people seeking to lose weight, whether they were using the drug as prescribed or off-label. Plaintiff would not have taken Trulicity if he had been provided a full and clear warning of the

---

[5] Carbajal, *Up to 15% of patients on weight loss drugs may be 'non-responders'*, Becker's Hospital Review (April 1, 2024) available at https://www.beckershospitalreview.com/glp-1s/up-to-15-of-patients-on-weight-loss-drugs-non-responders.html.

[6] Gao, *et al.*, *Efficacy and safety of semaglutide on weight loss in obese or overweight patients without diabetes: A systematic review and meta-analysis of randomized controlled trials*, Frontiers in Pharmacology 1 (2022).

[7] Wilding, *et al.*, *Weight regain and cardiometabolic effects after withdrawal of semaglutide: The STEP 1 trial extension*, 24 Diabetes Obes Metab. 1553, 1562 ("[T]reatment withdrawal led to most of the weight loss being regained within 1 year, …, reinforcing the need for continued treatment to maintain weight loss ….").

true risks of taking this drug, like the risk of developing NAION and its sequelae.

22.     Defendants' efforts to expand and grow the market both for treatment of diabetes and weight-loss, whether off-label or not, worked. The U.S. GLP-1 RA market is expected to exceed $100 Billion by 2030 with total U.S. users comprising about 9% of the population.[8] This growth is a tremendous boon to Defendants but comes at a significant cost. Financially, it is expected that Defendants' lobbying efforts will pay off, and GLP-1 RAs may get added to prescription drug coverage under Medicare Part D in the coming years. Some analysts project that this will add $13.6 to $26.8 Billion to Medicare Part D expenses even if only 10% of people with obesity use them, causing a significant shift in premiums and coverage in other areas.[9]

23.     The outsized growth of the market for GLP-1 RAs also means that the patient base has expanded to include many patients who would be better served choosing alternate treatment paths. Defendants' marketing campaigns have altered the public understanding of weight loss treatment, creating the impression that GLP-1 RAs are not just one tool among many available to doctors, but are instead "miracle drugs." But, these patients, like Plaintiff, were lured into a false sense of hope that GLP-1 RAs, such as Trulicity, would guarantee results and be efficacious and safe. Plaintiff injected Trulicity believing that he was doing something to promote his health when, in fact, it had the opposite effect.

24.     As a result of the foregoing, Plaintiff took Trulicity, which caused him to develop NAION. Plaintiff is now suffering from the devastating consequences of vision loss and will continue to suffer from the loss of vision for the rest of his life.

---

[8] J.P. Morgan Research, *The increase in appetite for obesity drugs* (Nov. 29, 2023), https://www.jpmorgan.com/insights/global-research/current-events/obesity-drugs.

[9] Baig et al., *Medicare Part D Coverage of Antiobesity Medications — Challenges and Uncertainty Ahead*, 388 NEJM 961 (2023).

**PARTY PLAINTIFF**

25.    Plaintiff, James Browning, is a citizen of the United States, and is a resident of the State of West Virginia.

26.    Plaintiff used Trulicity from on or about January 2020 to on or about November 2022.

27.    As a result of using Trulicity, Plaintiff was caused to suffer from NAION and its sequelae and, as a result, sustained severe and permanent personal injuries, pain, suffering, and emotional distress, and incurred medical expenses.

28.    As a result of using Trulicity, Plaintiff is suffering from a loss of vision.

**PARTY DEFENDANTS**

29.    Defendant Eli Lilly and Company is an Indiana corporation with a principal place of business at 893 S. Delaware St., Indianapolis, Indiana.

30.    Eli Lilly designed, researched, manufactured, tested, labeled, advertised, promoted, marketed, sold, and/or distributed Trulicity and is identified on the drug label.[10]

31.    Defendant Lilly USA, LLC is and at all relevant times has been an Indiana LLC with a principal place of business at Lilly Corporate Center, 893 S. Delaware St., Indianapolis, Indiana, with at least one member who is a citizen of Indiana.

32.    Defendants Eli Lilly and Company and Lilly USA, LLC are referred to collectively herein as "the Eli Lilly Defendants" or "Eli Lilly" or "Lilly."

---

[10] Mounjaro prescribing information, available at https://dailymed.nlm.nih.gov/dailymed/drugInfo.cfm?setid=d2d7da5d-ad07-4228-955f-cf7e355c8cc0 (last visited on 8/24/23)

33. Each of the Eli Lilly Defendants was the agent and employee of the other Eli Lilly Defendants and, in doing the things alleged, was acting within the course and scope of such agency and employment and with the other Eli Lilly Defendants' actual and implied permission, consent, authorization and approval.

34. In collaboration amongst themselves, as part of their business, and at all relevant times, the Eli Lilly Defendants designed, researched, manufactured, tested, labeled, advertised, promoted, marketed, sold, and/or distributed GLP-1 RAs, including Trulicity.

## **FACTUAL ALLEGATIONS**

### A. INTRODUCTION TO GLP-1 AND GLP-1 RA PRODUCTS, INCLUDING TRULICITY

35. Researchers first discovered GLP-1 in hamsters in 1983.[11] It is a hormone that helps regulate blood sugar, appetite, and digestion in animals, including humans; and is produced naturally in the brain and intestinal wall of humans.

36. In 1993, researchers discovered that a peptide from the venom of gila monsters activated GLP-1 receptors.[12] Gila monsters can go for months without eating but maintain stable blood sugar levels because they make very high levels of a glucagon peptide called exendin-4. Thus, the gila monster served as the inspiration for the GLP-1 RA class of drugs.

37. Following the discovery that exendin-4 is similar in structure to GLP-1, a synthetic version of exendin-4 was developed to treat diabetes. This became the first GLP-1 drug, known as Byetta, with the active ingredient exenatide, which came to market in 2005. Byetta was initially

---

[11] Bell et al., *Hamster preproglucagon contains the sequence of glucagon and two related peptides*, 302 Nature 716 (1983).

[12] Thorens et al., *Cloning and functional expression of the human islet glp-1 receptor*, 42 Diabetes 1678 (1993).

brought to market as a collaboration between the Eli Lilly Company and Amylin.[13] Whereas naturally-occurring GLP-1 has a short half-life of just a few minutes, Byetta's half-life was noted to be 2.4 hours.[14]

38.    Simultaneously with the development of exenatide, Novo Nordisk ("Novo") was developing another GLP-1 drug called liraglutide. In the early 1990s, Novo researchers discovered that when they injected liraglutide into rats, it caused them to stop eating almost entirely.[15] Liraglutide came to market in 2010, marketed initially as Victoza and later as Saxenda. Liraglutide has a half-life of 13-15 hours.[16]

39.    Various active ingredients fall within the GLP-1 RA class of drugs, including semaglutide (marketed by Novo as Ozempic, Wegovy, and Rybelsus), liraglutide (marketed by Novo as Saxenda, Victoza, and in combination with insulin as Xultophy 100/3.6), tirzepatide (marketed by Eli Lilly as Mounjaro and Zepbound), dulaglutide (marketed by Eli Lilly as Trulicity), exenatide (marketed by various companies as Byetta, Bydureon, and Bydureon BCise), albiglutide (marketed by GlaxoSmithKline as Tanzeum), and lixisenatide (marketed by Sanofi as Adlyxin and in combination with insulin as Soliqua 100/33).

40.    GLP-1 RAs are recognized by the U.S. Food & Drug Administration ("FDA") to constitute a "class" of drugs based on similarities in their mechanisms of action, physiologic

---

[13] News Release: Amylin and Lilly Announce FDA Approval of BYETTA(TM) (Exenatide Injection) (Apr. 29, 2005), *available at* https://investor.lilly.com/news-releases/news-release-details/amylin-and-lilly-announce-fda-approval-byettatm-exenatide (last visited Nov. 8, 2023) (describing the drug as a "collaboration" between Amylin and Lilly).

[14] Cai, et al., *Long-acting preparations of exenatide,* Drug Des. Devel. Ther. (Sept. 2013).

[15] Gina Kolata, *We Know Where New Weight Loss Drugs Came From, but Not Why They Work*, New York Times (Aug. 17, 2023), available at https://www.nytimes.com/2023/08/17/health/weight-loss-drugs-obesity-ozempic-wegovy.html.

[16] Rubino, *et al.*, *Effect of Weekly Subcutaneous Semaglutide vs Daily Liraglutide on Body Weight in Adults with Overweight or Obesity without Diabetes: The STEP 8 Randomized Clinical Trial,* JAMA (Jan. 2022).

9

effects, and chemical structure.[17] Defendants likewise recognize that their GLP-1 RAs are members of the same class.[18]

41.    Medications within the GLP-1 RA class of drugs mimic the activities of physiologic GLP-1 in numerous ways,[19] including attaching to GLP-1 receptors, sending various signals in the body, triggering a sensation of satiety (or perception of fullness, thereby curbing users' appetites and decreasing intake of calories and nutrients),[20] acting on the pancreas to stimulate the release of insulin, suppressing the release of glucagon, and slowing or inhibiting gastric emptying and intestinal motility.[21]

42.    In contrast to naturally-occurring GLP-1, which has a short life and is quickly metabolized by enzymes, GLP-1 RAs are engineered to last longer, as previously noted. The chemical structure of GLP-1 RAs includes a fatty chain that inhibits such quick dissolution. GLP-1 RAs such as tirzepatide and semaglutide have a long half-life of well over 100 hours, causing the drugs to stay in the body for a month or more after the last dose.

---

[17] *See* FDA Ozempic Summary Review, https://www.accessdata.fda.gov/drugsatfda_docs/nda /2017/209637Orig1s000SumR.pdf (including liraglutide, dulaglutide, and semaglutide in the GLP-1 RA class) (last visited Dec. 28, 2023); *see also* https://www.fda.gov/industry/structured-productlabeling-resources/pharmacologic-class (last visited Dec. 28, 2023).

[18] SURMOUNT-1 Clinical Trial Protocol at 45, available at https://cdn.clinicaltrials.gov/large-docs/22/NCT04184622/Prot_000.pdf ("General safety characteristics of all studied doses of tirzepatide were similar to those of the GLP-1R agonist class…"); STEP-1 Clinical Trial Protocol at 15, accessible at https://cdn.clinicaltrials.gov/large-docs/35/NCT03548935/Prot_002.pdf ("[T]he tolerability and safety profile [of semaglutide] was overall consistent with… the GLP-1 RA class in general.").

[19] Cleveland Clinic, *GLP-1 Agonists* (July 3, 2023), https://my.clevelandclinic.org/health/treatments/13901-glp-1-agonists.

[20] *See* Bloemendaal, *et al.*, *Effects of glucagon-like peptide 1 on appetite and body weight: focus on the CNS,* J. Endocrinology (Apr. 2014).

[21] Deane, *et al.*, *Endogenous Glucagon-Like Peptide-1 Slows Gastric Emptying in Healthy Subjects, Attenuating Postprandial Glycemia*, 95 J Clinical Endo Metabolism, 225 (2010).

43.     Most GLP-1 RAs are approved to treat type 2 diabetes,[22] but some (like Wegovy and Saxenda) are approved to treat obesity or to reduce cardiovascular risks.

44.     Most GLP-1 RAs are administered by injection, with the exception of Rybelsus, which is in tablet form.[23]

45.     Most of the GLP-1 RAs are weekly injectable drugs, except that liraglutide (the active ingredient in Saxenda and Victoza) is a daily injectable drug.[24]

46.     Most GLP-1 RAs are dosed between 0.25 and 2 milligrams per week, except that the maximum dose for Wegovy is 2.4 milligrams per week.

**B.     GLP-1 RAs ARE INEFFECTIVE IN MANY PATIENTS BECAUSE OF HIGH DISCONTINUATION RATES, MINIMAL TO NO WEIGHT LOSS FOR A SIGNIFICANT PERCENTAGE OF PATIENTS AND SUBSEQUENT REBOUND WEIGHT GAIN**

47.     Many patients find GLP-1 RAs ineffective because they discontinue use of the drugs.

48.     In May 2024, Blue Cross Blue Shield published an "Issue brief" that examined whether "patients prescribed [GLP-1 RAs] for weight loss are dropping out of treatment too quickly to attain the health benefits of these drugs." The company reviewed the behavior of nearly 170,000 GLP-1 RA users covered by Blue Cross Blue Shield and concluded that 30% of GLP-1 RA patients discontinued treatment within 4 weeks, that 58% of GLP-1 RA patients discontinued treatment within 180 days, and that patients who discontinue shortly after starting GLP-1 RA

---

[22] Unlike patients with type 1 diabetes, who cannot produce insulin, patients with type 2 diabetes cannot use insulin properly. *Compare* Cleveland Clinic, *Type 1 Diabetes* (March 9, 2022), available at https://my.clevelandclinic.org/health/diseases/21500-type-1-diabetes (last visited 10/3/24) *with* Cleveland Clinic, *Type 2 Diabetes* (Nov. 8, 2023), available at https://my.clevelandclinic.org/health/diseases/21501-type-2-diabetes.

[23] Cleveland Clinic, *GLP-1 Agonists* (July 3, 2023), https://my.clevelandclinic.org/health/treatments/13901-glp-1-agonists.

[24] *Id.*

therapy are unlikely to see *any* health benefits.[25] As a result, Blue Cross Blue Shield of Michigan, the largest health insurer in the state, announced a plan to greatly restrict coverage for GLP-1 RA prescriptions, citing concerns about efficacy and safety.[26]

49.      In June 2024, a real-world study of 4,066 insured GLP-1 RA weight-loss patients concluded that only 1 in 3 patients remained on GLP-1 RAs at one year, which "is substantially lower than what has been reported in clinical trials." The authors also concluded that the high discontinuation rates for GLP-1 RAs "create GLP-1 obesity treatment effectiveness concerns" because the value of the treatment "is not likely to be realized if [the GLP-1 RA] is discontinued during the first year and weight loss is not achieved or maintained."[27]

50.      A systematic review and network meta-analysis published in January 2024 reported that the effects of GLP-1 RAs on body weight gradually decline during long term use, indicating "potential limitations of GLP-1 RAs for sustained long term weight loss efforts."[28]

51.      Additionally, many people do not respond to GLP-1 RAs for weight-loss at all. Research suggests that approximately 14% of patients taking GLP-1RAs lost less than 5% of their body weight and one-third lost less than 10% of their body weight.[29]

---

[25] BLUE HEALTH INTELLIGENCE, REAL-WORLD TRENDS IN GLP-1 TREATMENT PERSISTENCE AND PRESCRIBING FOR WEIGHT MANAGEMENT, (May 2024),
https://www.bcbs.com/media/pdf/BHI_Issue_Brief_GLP1_Trends.pdf.

[26] Blue Cross Blue Shield of Michigan, *Changes coming for select weight loss drugs for some commercial members* (July 2024)
https://www.bcbsm.com/content/dam/microsites/corpcomm/provider/the_record/2024/jul/Record_0724h.html.

[27] Patrick P. Gleason, *Real-world persistence and adherence to glucagon-like peptide-1 receptor agonists among obese commercially insured adults without diabetes*, J. Managed Care + Specialty Pharm. (June 2024).

[28] Yao, *et al.*, *Comparative effectiveness of GLP-1 receptor agonists on glycaemic control, body weight, and lipid profile for type 2 diabetes: systematic review and network meta-analysis*, BMJ (Jan. 2024).

[29] Carbajal, *Up to 15% of patients on weight loss drugs may be 'non-responders*, Becker's

52.     In contrast to GLP-1 RAs, studies show that bariatric surgery is highly effective to treat type 2 diabetes and obesity, and to improve mortality for such patients.[30] Not only is bariatric surgery far more effective, it is also safer[31] and more cost-effective[32] than GLP-1 RAs.

53.     Likewise, other, well-established, prescription and over-the-counter medications with FDA approval for weight loss are available and offer significantly lower risk profiles than GLP-1 RAs. For example, Orlistat, an over-the-counter medication, was FDA-approved for weight loss in 1999 and has been shown to reduce fat absorption by up to 30%. While associated with some gastrointestinal adverse effects, they are much less severe than those seen with GLP-1 RAs and include fatty stools, fecal urgency, incontinence, and increased defecation.[33] Similarly, a prescription appetite suppressant combining phentermine and topiramate has been approved since

---

Hospital Review (April 1, 2024) available at https://www.beckershospitalreview.com/glp-1s/up-to-15-of-patients-on-weight-loss-drugs-non-responders.html.

[30] *See, e.g.*, Courcoulas, *et al.*, *Long-term outcomes of medical management vs bariatric surgery in type 2 diabetes*, 331 JAMA 654 (2024) ("After 7 to 12 years of follow-up, individuals originally randomized to undergo bariatric surgery compared with medical/lifestyle intervention had superior glycemic control with less diabetes medication use and higher rates of diabetes remission."); Syn, *et al.*, *Association of metabolic-bariatric surgery with long-term survival in adults with and without diabetes: a one-stage meta-analysis of matched cohort and prospective controlled studies with 174772 participants*, 397 Lancet 1830 (2021) ("Median life expectancy was approximately 9.3 years (95% CI 7.1–11.8) longer for patients with diabetes in the surgery group than in the control group. […] Among adults with obesity, metabolic–bariatric surgery is associated with substantially lower all-cause mortality rates and longer life expectancy than usual obesity management.") .

[31] *See, e.g.*, Dicker, et al., *Bariatric metabolic surgery vs glucagon-like peptide-1 receptor agonists and mortality*, JAMA OPEN (2024) (finding bariatric metabolic surgery to be "associated with a 62% reduction in mortality compared with GLP-1 RAs").

[32] *See, e.g.*, Reed, *Bariatric surgery found more cost-effective than GLP-1s*, Axios, available at https://www.axios.com/2024/10/21/bariatric-surgery-more-cost-effective-glp1 (last visited 10/21/24); Sanchez, *et al.*, *Comparative Cost-Effectiveness Analysis of Bariatric Surgery and GLP-1 Receptor Agonists for the Management of Obesity*, Northwestern University Feinberg School of Medicine, available at https://www.surgery.northwestern.edu/docs/edelstone-bendix-research-poster/2024-posters/Sanchez-Joseph.pdf (last visited 10/21/24).

[33] Filippatos, *et al.*, *Orlistat-associated adverse effects and drug interactions: a critical review.* DRUG SAF. 2008;31(1):53-65.

2012 and has been shown effective for long-term weight loss. While contraindicated in pregnancy, other risks are generally non-severe and include dizziness, constipation, dry mouth, and inattention.[34]

54. Similarly, an alternate treatment of type 2 diabetes is Metformin. Johns Hopkins' "Patient Guide to Diabetes" describes Metformin as the "treatment of choice for type 2 diabetes." This guide describes Metformin as "very effective at controlling blood glucose and lowers A1C as much as 15%." The listed side effects include diarrhea and rare lactic acidosis.[35] Meanwhile, "in studies of GLP-1 receptor agonists used alone or in combination with oral antihyperglycemic therapies, mean changes in A1C ranged from −0.8 to −1.7%"[36]

55. A meta-analysis of Metformin found "there is no significant risk of GI AEs associated neither with the dose size of metformin nor metformin treatment duration." This same study found "GLP-1 RA and acarbose were ranked as having the highest incidence of GI AEs."[37] Therefore, GLP-1 RAs, including Trulicity, offer minimal increased benefit as it relates to diabetes, while increasing the risk of gastrointestinal adverse injuries, as well as the risk NAION and its sequelae.

---

[34] Lei XG, *et al*., *Efficacy and Safety of Phentermine/Topiramate in Adults with Overweight or Obesity: A Systematic Review and Meta-Analysis.* OBESITY (SILVER SPRING). 2021 June;29(6):985-994.

[35] Johns Hopkins University, The Johns Hopkins Patient Guide to Diabetes, https://hopkinsdiabetesinfo.org/medications-for-type-2-diabetes-metformin/ (last accessed November 10, 2024).

[36] Deborah Hinnen, *Glucagon-Like Peptide 1 Receptor Agonists for Type 2 Diabetes*, 30 DIABETES SPECTR 202–210 (2017).

[37] Nabrdalik, *et al*., *Gastrointestinal adverse events of metformin treatment in patients with type 2 diabetes mellitus: A systematic review, meta-analysis and meta-regression of randomized controlled trials*, Front Endocrinol (Lausanne) (Sept. 14 2022) 13:975912. doi: 10.3389/fendo.2022.975912. PMID: 36187122; PMCID: PMC9524196.

## C.    THE REGULATORY HISTORY OF TRULICITY

56.    On September 18, 2014, the FDA approved Lilly's Biologics License Application ("BLA") for dulaglutide "as an adjunct to diet and exercise to improve glycemic control in adults with type 2 diabetes mellitus" to be marketed as Trulicity in "single dose pre-filled syringes and pre-filled pens." As initially approved, the recommended dose for Trulicity was 1.5 mg per week.[38]

57.    On April 19, 2019, Lilly submitted supplemental BLA 125469/S-033, requesting approval to expand its marketing of Trulicity by adding an indication for reduction of major cardiovascular events in adults with type 2 diabetes. On February 21, 2020, the FDA approved the request.[39]

58.    On November 4, 2019, Lilly submitted BLA 125469/S-036, seeking approval for higher doses (3 mg per week and 4.5 mg per week) of Trulicity. On September 3, 2020, the FDA approved that request.[40]

59.    On May 17, 2022, Lilly submitted BLA 125469/S-051, seeking to add an indication for a new patient population: "pediatric patients 10 years of age and older with type 2 diabetes mellitus."

60.    On November 17, 2022, the FDA approved the drug for pediatric use.[41] The supplemental approval also added 'ileus' as a gastrointestinal adverse reaction reported during

---

[38] FDA Approval Letter for BLA 125469/0 (Sept. 18, 2014), available at https://www.accessdata.fda.gov/drugsatfda_docs/appletter/2014/125469Orig1s000ltr.pdf.
[39] FDA Approval Letter for BLA 125469/S-033 (Feb. 21, 2020), available at https://www.accessdata.fda.gov/drugsatfda_docs/appletter/2020/125469Orig1s033ltr.pdf.
[40] *See News Release: FDA approves additional doses of Trulicity (dulaglutide) for the treatment of type 2 diabetes,* Eli Lilly (Sept. 3, 2020) available at https://investor.lilly.com/news-releases/news-release-details/fda-approves-additional-doses-trulicityr-dulaglutide-treatment.
[41] FDA Approval Letter for BLA 125469/S-051 (Nov. 17, 2022), available at https://www.accessdata.fda.gov/drugsatfda_docs/appletter/2022/125469Orig1s051ltr.pdf.

15

post-approval use of Trulicity in the prescribing information (PI) to Section 6.2 Postmarketing Experience.[42]

**D. DEFENDANTS WERE ON NOTICE THAT TRULICITY IS ASSOCIATED WITH NAION AND ITS SEQUELAE**

61.     GLP-1 RAs are treated as a class by the FDA, and the class of drugs shares a similar mechanism of action, similar physiologic effect, and similar chemical structure.

62.     Defendants knew or should have known of the causal association between the use of Trulicity and the risk of developing NAION and its sequelae, but they ignored it. Defendants' actual and constructive knowledge derived from their clinical studies, adverse events reports made to them, and medical literature, including the epidemiological studies, and case reports referenced in this Complaint.

63.     It has been known since at least 2016 that the human eye contains GLP-1 receptors.[43]

64.     On July 3, 2024, the *JAMA Ophthalmology* published a study suggesting an association between semaglutide and NAION. The study, which evaluated data from December of 2017 through November of 2023, showed that patients with type 2 diabetes taking semaglutide had a more than three times greater risk of developing NAION than those taking non-GLP-1 RA medications. For patients taking semaglutide for overweight/obesity indications, the risk of developing NAION was nearly seven times greater than non-GLP-1 RA medications.[44]

---

[42] Trulicity Label (November 17, 2022), available at
https://www.accessdata.fda.gov/drugsatfda_docs/label/2022/125469s051lbl.pdf.
[43] Hernández C et al, *Topical Administration of GLP-1 Receptor Agonists Prevents Retinal Neurodegeneration in Experimental Diabetes,* DIABETES 2016 Jan;65(1):172-87. doi: 10.2337/db15-0443. Epub 2015 Sep 17. PMID: 26384381.
[44] Specifically, the study showed a cumulative incidence of NAION of 8.9% in type 2 diabetes patients taking semaglutide, compared to only 1.8% for patients not taking GLP-1RA

65.     The *JAMA* study referenced a potential causal mechanism, proposing that "expression of the GLP-1 receptor in the human optic nerve and GLP-1 RA induced enhanced sympathetic nervous system activity might influence optic nerve head perfusion and potentially increase the risk of NAION."[45]

66.     The FDA's Adverse Events Reporting System (FAERS) shows multiple reports of "Optic Ischaemic Neuropathy" reported in connection with use of GLP-1RAs. The earliest reported Optic Ischaemic Neuropathy event associated with any GLP-1RA occurred in 2012.[46] Analysis of this data shows that patients taking GLP-1RA drugs report injuries associated with NAION at a statistically-significantly greater rate than patients taking other diabetes or weight-loss drugs.[47]

---

medications, with a hazard ratio of 4.28. For overweight/obese patients, the cumulative incidence of NAION was 6.7% for patients taking semaglutide, compared to only 0.8% for those not taking GLP-1RAs, with a hazard ratio of 7.64. Hathaway, et al., *Risk of Nonarteritic Anterior Ischemic Optic Neuropathy in Patients Prescribed Semaglutide*, 142 JAMA OPHTHALMOLOGY 732 (2024).

[45] *Id.*

[46] The FAERS database is accessible online at https://www.fda.gov/drugs/questions-and-answers-fdas-adverse-event-reporting-system-faers/fda-adverse-event-reporting-system-faers-public-dashboard. See also Castellana E, *Potential risk of non-arteritic anterior ischaemic optic neuropathy in semaglutide users: pharmacovigilance insights*, EUR. J. HOSP. PHARM. (2024) (online ahead of print). Note that FAERS does not contain a code for NAION itself, only "optic ischemic neuropathy," a condition that encompasses NAION.

[47] *See* Kim et al., *Adverse drug reaction patterns of GLP-1 receptor agonists approved for obesity treatment: Disproportionality analysis from global pharmacovigilance database*, DIABETES OBES. METAB. (2025) (online ahead of print) (finding 80% increased risk of reporting vision loss compared to other weight-loss drugs); Massey et al., *Increased vision impairment reports linked to semaglutide: analysis of FDA adverse event data*, BMC MEDICINE (2025) (finding increased reporting rates of vision impairment for Semaglutide ranging from 57% to 289% in comparison to various weight-loss and diabetes drugs); Azab et al., *Semaglutide: Nonarteritic Anterior Ischemic Optic Neuropathy in the FDA adverse event reporting system*, OBESITY RESEARCH & CLINICAL PRACTICE (2025) (online ahead of print) (finding increased risk of reporting of optic ischaemic neuropathy of over 1000%); Procacci et al., *Disproportionality analysis on semaglutide and nonarteritic anterior ischemic optic neuropathy in the FDA adverse event reporting system: An emerging pharmacovigilance signal?*, OBESITY RESEARCH & CLINICAL PRACTICE (2025) (online ahead of print) (finding increased risk of reporting of optic ischaemic neuropathy of over 1000%)

17

67. Fourteen cases of NAION suspected to be causally associated with use of GLP-1RA drugs have been reported in published, peer-reviewed case reports.[48] Notably in one of these cases the patient experienced re-challenge when her NAION worsened after re-starting her GLP-1RA drug.[49] Three of the published cases were in patients who developed NAION following treatment with tirzepatide.[50] These cases represent the first peer-reviewed, published reports directly linking tirzepatide to NAION.

68. A study of diabetic patients in Denmark between 2018 and 2024 showed that use of semaglutide "more than doubles the risk of NAION, even when multiple other factors have been taken into account." The study observed that "after the introduction of once-weekly semaglutide in Denmark in November 2018, the annual number of first-time NAION episodes reached an all-time high for the years 2019-2023."[51]

69. A 2024 cohort study conducted in Denmark and Norway showed that users of semaglutide were almost twice as likely to develop NAION than those taking sodium-glucose co-transporter 2 inhibitors ("SGLT-2is"), another class of prescription medications used to treat type

---

[48] Maceroni et al., *Non arteritic ischemic optic neuropathy in a patient taking semaglutide: Is there a relation? A case report and a review of the literature*, EUROPEAN JOURNAL OF OPHTHALMOLOGY (2025) (reporting one case); Ahmadi et al., *Anterior ischemic optic neuropathy in patients treated with semaglutide: report of four cases with a possible association*, BMC OPHTHALMOLOGY (2025) (reporting four cases); Katz et al., *Ophthalmic Complications Associated With the Antidiabetic Drugs Semaglutide and Tirzepatide*, JAMA OPHTHALMOLOGY (2025) (online ahead of print) (reporting nine cases).

[49] *See* Katz et al.

[50] *See* Katz et al.

[51] Jakob Grauslund, et al., *Once-weekly semaglutide doubles the five-year risk of nonarteritic anterior ischemic optic neuropathy in a Danish cohort of 424,152 persons with type 2 diabetes*, INT. J. RETINA AND VITREOUS, 10, 97 (2024), available at https://journalretinavitreous.biomedcentral.com/articles/10.1186/s40942-024-00620-x

2 diabetes.[52]

70. In response to these studies, the Danish Medicines Agency has requested that the European Pharmacovigilance Risk Assessment Committee (PRAC) further investigate the link between Ozempic and NAION.[53]

71. Subsequent studies lend further support for the causal association between NAION and GLP-1RA drugs. The paper by Hsu et al. published in JAMA Ophthalmology analyzing hundreds of thousands of patients from a large national database found "an increased NAION risk was also observed among patients with diabetes who had a history of Ozempic (Novo Nordisk) use or stand-alone Ozempic (Novo Nordisk) prescription history," particularly in patients taking GLP-1RA drugs for multiple years.[54] Likewise a paper by Cai et al, also published in JAMA Ophthalmology and using data from a large national database, found an increased risk of NAION among patients taking semaglutide using a self-controlled case series analysis, which effectively compares the risk for individual patients developing NAION while taking or not taking semaglutide.[55]

72. A retrospective study of over 150,000 type 2 diabetics with no prior eye disorders who had been prescribed semaglutide or tirzepatide found that use of these drugs was associated

---

[52] Simonsen et al., *Use of semaglutide and risk of non-arteritic anterior ischemic optic neuropathy: A Danish–Norwegian cohort study*, DIABETES OBES METAB. (2025) (online ahead of print).

[53] *Suspicion of rare eye condition from Ozempic use to be investigated further*, Danish Medicines Agency, (December 16, 2024), https://laegemiddelstyrelsen.dk/en/news/2024/suspicion-of-rare-eye-condition-from-ozempic-use-to-be-investigated-further/.

[54] Hsu et al., *Semaglutide and Nonarteritic Anterior Ischemic Optic Neuropathy Risk Among Patients With Diabetes*, JAMA OPHTHALMOLOGY (2025) (online ahead of print).

[55] Cai et al., Semaglutide and Nonarteritic Anterior Ischemic Optic Neuropathy, JAMA Ophthalmology (2025) (online ahead of print).

with a 76% increased risk of NAION..[56]

73.    A meta-analysis of clinical trials of GLP-1RA drugs, found a non-statistically significant increased risk of optic ischemic neuropathy. The authors note that optic ischemic neuropathy is rare and may have been underreported in the clinical trials, leading to a lower estimated risk. The overall rate of optic ischemic neuropathy was higher in the treatment group than the control group: 5.6 and 3.0 cases per 100,000 patient-years, respectively. The authors also note that "inappropriate use of drugs for inducing weight loss in moderately overweight patients with low cardiovascular risk could be associated with rare, but severe, adverse effects, possibly including NAION.".[57]

74.    Another metanalysis of clinical trial data had a similar result, finding an overall non-statistically significant increased risk of NAION in patients taking GLP-1RAs. The authors note that the results of their study are potentially biased by the very small number NAION events in the clinical trials and the failure of study authors to accurately report on NAION.[58]

75.    On June 27, 2025, the World Health Organization issued a safety alert to health-care professionals and regulatory authorities about the risk of NAION associated with the use of semaglutide medicines, in light of "the widespread global use of semaglutide and the serious nature

---

[56] Wang et al., Semaglutide or Tirzepatide and Optic Nerve and Visual Pathway Disorders in Type 2 Diabetes, JAMA Ophthalmology, (2025).

[57] Silverii et al., *Glucagon-like peptide 1 (GLP1) receptor agonists and risk for ischemic optic neuropathy: A meta-analysis of randomised controlled trials, 27* DIABETES OBES METAB 1005, (2025).

[58] Ozbek et al., Nonarteritic anterior ischemic optic neuropathy and glucagon-like peptide-1 receptor agonists: Evaluating a potential association, European Journal of Medicine, (2025).

of NAION."[59] The European Medicines Agency has also recommended updating the product information for semaglutide medicines to include the risk of NAION.[60]

76.    Defendants knew or should have known that there was reasonable evidence of a causal association between the use of Trulicity and the risk of developing NAION and its sequelae, but they ignored it. Defendants' actual and constructive knowledge derived from their clinical studies and adverse event reports as well as publicly available medical literature, including the medical literature and case reports referenced in this Complaint. Defendants' failure to advise Plaintiff and his doctors of this risk has caused him to permanently lose his ability to see.

### E.    BACKGROUND ON PHARMACEUTICAL MARKETING

#### 1.    Regulatory Framework for Pharmaceutical Advertising

77.    Pharmaceutical marketing and promotional labeling are regulated by the FDA.

78.    By statute, the FDA defines the term "labeling" as "all labels and other written, printed, or graphic matter (1) upon any article or any of its containers or wrappers, or (2) accompanying such article."[61] The statute contemplates that certain marketing materials are part of the product's labeling: "brochures, booklets, mailing pieces, detailing pieces, file cards, bulletins, calendars, price lists, catalogs, house organs, letters, motion picture films, film strips, lantern slides, sound recordings, exhibits, literature, and reprints and similar pieces of printed, audio, or visual matter descriptive of a drug and references published . . . for use by medical practitioners, pharmacists or nurses containing drug information supplied by the manufacturer, . .

---

[59] *See* World Health Organization Medical Product Alert, June 27, 2025, *available at* https://www.who.int/news/item/27-06-2025-27-06-2025-semaglutide-medicines-naion    (last accessed Sept. 7, 2025).

[60] *See* European Medicines Agency News Announcement, June 6, 2025, *available at* https://www.ema.europa.eu/en/news/prac-concludes-eye-condition-naion-very-rare-side-effect-semaglutide-medicines-ozempic-rybelsus-wegovy (last accessed Sept. 7, 2025).

[61] 21 U.S.C. § 321(m).

. of the drug and which are disseminated by or on behalf of its manufacturer . . . are hereby determined to be labeling as defined in section 201(m) of the act."[62]

79.    The FDA recognizes a difference between direct-to-consumer ("DTC") advertisements and promotional labeling.[63] According to the FDA: "DTC ads are published in magazines and newspapers that are distributed to a general audience rather than to healthcare providers such as doctors, nurses, and pharmacists. DTC ads can also be broadcast through television or radio." In contrast to those direct-to-consumer *advertisements*, the FDA notes: "Other types of materials, such as brochures, booklets, or pamphlets distributed to patients, caregivers, or other non-healthcare providers are considered DTC *promotions*. While many people would think these are ads, they are technically considered a different category, called promotional labeling."[64]

80.    The FDA distinguishes this separate category of "promotional labeling," from advertisements: "Promotional labeling and advertising are both used to help sell prescription drugs. Promotional labeling differs from advertising in the way it is distributed. Ads are usually broadcast on TV or radio, or are published in newspapers or magazines. Promotional labeling includes additional types of materials and ways to get them to the consumer. . . ."[65] Importantly, "[p]romotional labeling about a drug is said to 'accompany' that drug, even if the promotional labeling is not physically attached to a drug container. Promotional labeling must be accompanied by the drug's prescribing information.'"[66]

81.    Under the Federal Food, Drug, and Cosmetic Act ("FD&C Act") and FDA's

---

[62] 21 CFR § 202.1(k)(2).

[63] U.S. FOOD AND DRUG ADMIN., *Drug Advertising: A Glossary of Terms*, (Jan. 19, 2020) https://www.fda.gov/drugs/prescription-drug-advertising/drug-advertising-glossary-terms.

[64] *Id*. (emphasis added).

[65] *Id.*

[66] *Id.*

implementing regulations, drug promotional labeling and prescription drug advertising must be truthful and non-misleading, convey information about the drug's efficacy and its risks in a balanced manner, and reveal material facts about the drug.[67]

82.     FDA guidance indicates that "Firms generally have flexibility with respect to the presentation of efficacy and risk information about their products as long as the presentation is not false or misleading and complies with other applicable statutory and regulatory requirements."[68] Despite that flexibility, the FDA instructs firms that when they develop DTC promotional communications, "they should consider how to best convey information about a drug's efficacy and risks so the audience understands the information."[69]

83.     When evaluating communication of the risks in a promotional piece, FDA guidance states that it "looks not just at specific risk-related statements, but at the net impression - i.e., the message communicated by all elements of the piece as a whole."[70] In other words, the FDA recognizes that pharmaceutical marketing must have fair balance defined as:

> law requires that product claim ads give a "fair balance" of information about drug risks as compared with information about drug benefits. This means that the content and presentation of a drug's most important risks must be reasonably similar to the content and presentation of its benefits. This does not mean that equal space must be given to risks and benefits in print ads, or equal time to risks and benefits in broadcast ads. The amount of time or space needed to present risk information will depend on the drug's risks and the way that both the benefits and risks are presented.[71]

---

[67] U.S. FOOD AND DRUG ADMIN, PRESENTING QUANTITATIVE EFFICACY AND RISK INFORMATION IN DIRECT-TO-CONSUMER (DTC) PROMOTIONAL LABELING AND ADVERTISEMENTS GUIDANCE FOR INDUSTRY (Dec. 2023), https://www.fda.gov/media/169803/download.

[68] *Id*. (emphasis added).

[69] *Id*.

[70] U.S. FOOD AND DRUG ADMIN., DRAFT GUIDANCE FOR INDUSTRY: PRESENTING RISK INFORMATION IN PRESCRIPTION DRUG AND MEDICAL DEVICE PROMOTION (May 2009) https://www.fda.gov/media/76269/download (emphasis in original).

[71] U.S. FOOD AND DRUG ADMIN., *Drug Advertising: A Glossary of Terms*, (Jan. 19, 2020) https://www.fda.gov/drugs/prescription-drug-advertising/drug-advertising-glossary-terms.

84.     The definition of "fair balance" is not black and white. Indeed, the FDA recognizes the impact emotion can have on an individual's ability to understand risks or benefits of a drug. For example, in the FDA Evidence Based User Guide for Pharmaceutical Marketing, the FDA notes that "[a]ffect and emotion influence perceptions of likelihood, value, and the risk-benefit balance. These feelings and thoughts interact but also separately predict risk perceptions and decisions. Feelings can limit effective risk communication sometimes, but are often critical to good decision-making; their power can be harnessed in persuasive and non-persuasive communication."[72]

85.     The FDA also recognizes the fact that sophisticated marketing techniques influence physician prescribing behavior. This phenomenon is described in draft guidance, where the FDA explains that "[r]esearch demonstrates that promotional communications about medical products often employ marketing techniques that are effective at influencing attitudes and behaviors of HCPs [("Healthcare Providers")], and that how information is presented can impact HCP impressions of that information. These marketing techniques can influence attitudes and behavior, independent of the quality of the information, even among highly educated medical professionals."[73]

86.     The power and influence of marketing, even on healthcare providers, is one reason the FDA forbids "off-label" marketing. Off-label marketing occurs when an FDA-approved drug

---

[72] BARUCH FISCHOFF ET AL, U.S. FOOD AND DRUG ADMIN., COMMUNICATING RISK AND BENEFITS: AN EVIDENCE BASED USER'S GUIDE, (Aug. 2011), https://www.fda.gov/files/about%20fda/published/Communicating-Risk-and-Benefits---An-Evidence-Based-User%27s-Guide-%28Printer-Friendly%29.pdf.

[73] U.S. FOOD AND DRUG ADMIN., DRAFT GUIDANCE FOR INDUSTRY: COMMUNICATIONS FROM FIRMS TO HEALTH CARE PROVIDERS REGARDING SCIENTIFIC INFORMATION ON UNAPPROVED USES OF APPROVED/CLEARED MEDICAL PRODUCTS, (Oct. 2023), https://www.fda.gov/media/173172/download.

or device is advertised for a purpose for which it is not approved. It is legal for a physician or other prescriber to prescribe an FDA-approved drug for an off-label use but it is illegal to market those drugs for such off-label use. Promoting or advertising a drug for anything other than its FDA-approved use, the manufacturer is described as illegal "misbranding."[74] When a drug such as Trulicity is marketed or promoted for weight loss, that is considered off-label marketing and the products are considered "misbranded" under the governing FDA regulations.

87.    It is recognized that off-label marketing can harm patients, third-party payors, competitor manufacturers, and researchers and clinicians in multiple ways.[75] This includes the exposure to adverse side effects from drugs that have not been adequately tested for safety and effectiveness in treatment of a particular condition.[76] This can occur when the off-label promotion taps a market demand without spending the time or money to get full safety clearance by the FDA.[77]

### 2.    Methods of Pharmaceutical Marketing

88.    Pharmaceutical marketing is a sophisticated industry that follows well-established practices. It is typically a well-integrated process, where both patients and physicians targeted by a manufacturer's marketing receive a seamless experience and consistent messaging through advertising, personal selling, sales promotions, public relations, and branded and unbranded marketing.

89.    "Branded" marketing is marketing that directly states the prescription drug name.

---

[74] Van Norman GA, *Off-Label Use vs Off-Label Marketing: Part 2: Off-Label Marketing-Consequences for Patients, Clinicians, and Researchers*, 8 JACC BASIC TRANSL SCI. 359-370, (2023).
[75] *Id*.
[76] *Id*.
[77] *Id*.

Branded marketing for prescription drugs is overseen by the FDA and must meet certain requirements. These include requirements that it must not be false or misleading; must have fair balance between efficacy and risk information; and must reveal material facts about the drug being promoted, including facts about the consequences that may result from use of the drug.[78]

90.      "Unbranded" campaigns typically contain "help-seeking" advertisements or "disease-state awareness" materials. Unlike branded promotion, it is not regulated by the FDA.[79] Consumer-facing unbranded materials generally describe a disease or condition – like obesity – but do not recommend a specific drug to treat this condition. Instead, the advertisement directs the patient to speak with their physician. Industry experts recognize that unbranded campaigns can be particularly helpful when focusing on a condition that may be stigmatized or difficult to talk about with a provider.[80] Physician-facing unbranded materials provide ostensibly neutral scientific information about diseases and various approaches to treating them without specifically calling for the use of a manufacturers drug.

91.      Pharmaceutical marketing is most effective when it utilizes both branded and unbranded campaigns.

92.      Branded and unbranded marketing campaigns can be conducted through a variety of marketing channels. Common channels of pharmaceutical marketing include the use of sales representatives, DTC marketing, advocacy groups, key opinion leaders / speaker programs, social

---

[78] U.S. FOOD AND DRUG ADMIN., *The Bad Ad Program* (Dec. 12, 2024) https://www.fda.gov/drugs/office-prescription-drug-promotion/bad-ad-program.

[79] U.S. FOOD AND DRUG ADMIN., *Basics of Drug Ads*, (June 19, 2015) https://www.fda.gov/drugs/prescription-drug-advertising/basics-drug-ads.

[80] Beth Snyder Bulik, *Unbranded pharma ads—what are they good for? Actually quite a bit, marketing panelists say,* FIERCE PHARMA (Mar. 11, 2018), https://www.fiercepharma.com/marketing/unbranded-pharma-ad-what-are-they-good-for-actually-quite-a-bit-marketer-panelists-say.

media and online websites, partnerships with telehealth providers and clinicians, television, print and radio advertisements, and coupon programs.

93.    Defendants utilize an "omnichannel" marketing scheme, which collects and collates data across promotional "channels" to optimally target health care providers and potential customers.

94.    Eli Lilly combines this omnichannel strategy and the resulting data pool with the use of algorithms and machine learning to create some of the most powerful pharmaceutical marketing to date.

### 3.    Eli Lilly's Marketing and Promotion of Trulicity

95.    At all relevant times, Eli Lilly was in the business of and did design, research, manufacture, test, advertise, promote, market, sell, and/or distribute Trulicity.

96.    Lilly made a substantial monetary investment in swaying the medical consensus by making direct payments to physicians and financially supporting or infiltrating numerous healthcare advocacy groups; Lilly spent vast sums of money on all forms of advertising and marketing to grow consumer demand, including promoting off-label use of Trulicity; and Lilly spent millions of dollars on lobbying for changes in the law to support broader financial support and access for obesity treatments.

97.    As part of the promotion of Trulicity, Lilly targeted approximately 40,000 physicians.[81]

98.    A key opinion leader ("KOL") is a trusted, well-respected professional with proven experience and expertise in a particular field. Often, in the pharmaceutical space, these thought leaders are physicians. These KOLs have extensive experience and carry significant influence

---

[81] Eli Lilly & Co Conf Presentation Call 2022524 DN000000002983664779.pdf.

27

which allows them to promote new drugs. Defendants have made paying and supporting KOLs a centerpiece of their influence strategy.

99.    One of Lilly's KOLs is Dr. Marschall Runge, Executive Vice President for Medical Affairs and Chief Executive Officer of Michigan Medicine since March 2015 and Dean of the Medical School since January 2016.

100.    Dr. Runge served on Ely Lilly's Board of Directors from 2013 until his recent retirement. During that time, on April 12, 2017, Dr. Runge published an article about obesity care without disclosing his financial relation to Lilly. Between 2021 and 2023, Lilly paid Dr. Runge a total of $926,147.

101.    Lilly has also funded Dr. Ania Jastreboff since at least 2018. Dr. Jastreboff has appeared on Oprah discussing the benefits of GLP-1 RAs for the treatment of obesity.[82] Dr. Jastreboff has provided medical education through The Obesity Society, advocating for the use of pharmaceutical treatment for obesity.[83] Between 2020 and 2023, Lilly paid Dr. Jastreboff nearly $100,000.[84]

102.    Dr. Ania Jastreboff was the first author on The Obesity Society's 2018 position statement defining obesity as a disease and advocating for additional treatments where she disclosed that she received consulting fees from both Novo and Lilly.[85]

---

[82] https://youtu.be/kMI9b3_TWt0?si=mmq6gSTu1W8igLun.

[83] https://www.obesity.org/meetings-education/grandrounds/.

[84] https://openpaymentsdata.cms.gov/company/100000000088.

[85] Obesity as a Disease: The Obesity Society 2018 Position Statement, available at https://www.obesity.org/wp-content/uploads/2019/04/Jastreboff_et_al-2019-Obesity.pdf.

103.    Lilly purchased 184,000 meals for doctors amounting to roughly $3.5 Million in 2022 while promoting its drugs Mounjaro and Trulicity.[86]

104.    EveryBODY Covered is a campaign for obesity care coverage that is led by the Alliance for Women's Health & Prevention and funded by Lilly.[87] It features articles from KOLs such as Dr. Maria Abreu, who argue that "Obesity is Not a Lifestyle."[88] The article does not disclose that Dr. Abreu is a paid consultant for Lilly.[89]

105.    Defendants directly or indirectly pay or influence numerous influential advocacy groups to influence medical and public opinion regarding obesity, the treatment for obesity, and the safety and efficacy of GLP-1 RAs. These include, among others, The Obesity Society, The Obesity Action Coalition, Obesity in Action Coalition, American Board of Obesity Medicine, and Stop Obesity Alliance.

106.    Lilly donates more than $100,000 to the Obesity Action Coalition annually, and is a corporate sponsor of the Stop Obesity Alliance. Lilly is a corporate member of All About Obesity, and has made payments to both of its board's members. Lilly also sponsors The World Obesity Federation which is another advocacy group that runs the campaigns "Let's Talk About Obesity & …" as well as World Obesity Day.[90] This campaign is unique in that it also advocates for increased treatment for youth and kids.

---

[86]    https://www.forbes.com/sites/johnlamattina/2023/07/20/fattening-doctors-to-promote-weight-loss-drugs/ (last accessed Oct. 10, 2024).

[87] Everybodycovered.org and https://www.instagram.com/everybodycovered/.

[88] https://news.med.miami.edu/dr-maria-abreu-obesity-is-not-a-lifestyle/ (linked from everybody Covered Instagram).

[89] https://www.practiceupdate.com/author/maria-abreu/4098.

[90] https://www.worldobesityday.org/.

107.    Lilly is also a Corporate Partner/Gold Sponsor for American Association of Clinical Endocrinologists;[91] serves on Endocrine Society "Corporate Liaison Board";[92] is a member of American College of Cardiology ("ACC") "Industry Advisory Forum," in which Lilly contributes at least $25,000 annually (the ACC website says the Industry Advisory Forum "organization[s] will have a front-row seat to discussions on topics of mutual interest and importance impacting the cardiovascular healthcare environment."); sits on the "Chairman's Council" for the OAC;[93] and provided financial backing to the OAC "Your Weight Matters" campaign[94] where, as part of the campaign, a new public service announcement ("PSA") was launched to encourage Americans to "take control of their health" by starting "vital" conversations with their healthcare providers (those who took part in the campaign, *i.e.*, took the challenge, received a book that included information on "medical weight management" and the "FDA-approved prescription medications, including injections and oral medications, designed to assist with chronic weight management"); and is a sponsor of of the "Obesity Care Week" Conference in the United States[95] that advocates for "clinically-based care" for obesity, which primarily means use of GLP-1 RAs.

108.    Lilly has presented on the topic of Obesity at the American Diabetes Association,[96] Obesity Week, the European Association for the Study of Diabetes, American Heart Association, Endocrine Society, and European Association for the Study of Obesity/European Congress on

---

[91] https://pro.aace.com/about/corporate-aace-partnership-cap (last accessed Oct. 17, 2024).

[92] https://www.endocrine.org/partnerships (last accessed July 8, 2024).

[93] *See* https://www.obesityaction.org/wp-content/uploads/OAC-Annual-Report-2023.pdf (last accessed Oct. 9, 2024).

[94] *See* https://www.fiercepharma.com/marketing/eli-lilly-novo-nordisk-and-other-big-pharmas-back-oacs-your-weight-matters-campaign (last accessed Oct. 9, 2024).

[95] https://www.obesitycareweek.org/partners/.

[96] https://medical.lilly.com/us/science/conferences/obesity/ada2024.

30

Obesity.[97] Specific presentations include the "Development of the Pediatric Weight Questionnaire" and "Real-World Characteristics of Adults with Obesity or Overweight Treated with Tirzepatide in the US."[98] The Obesity Week presentation poster acknowledged that some patients are initiating tirzepatide when they are a normal body weight at baseline – that is, the poster recognizes there is off-label usage of the drug.[99]

109.    Lilly has been attempting to control and mold the relevant medical literature for decades:

- Dating back as early as 2010, Lilly funded research that resulted in publications titled "Nonsurgical Weight Loss for Extreme Obesity in Primary Care Settings."[100]

- Lilly's clinical trials program includes almost 17,000 individuals being studied for just tirzepatide.[101]

- Lilly has also done significant research into the attitudes of patients, physicians, and employers regarding obesity in an attempt to increase the sales of their drugs.[102]

110.    Lilly has also embarked along similar efforts in conjunction with the other major manufacturer of GLP-1 RAs, Novo Nordisk:

- In May of 2013, American Association of Clinical Endocrinologists releases Consensus Statement on "Comprehensive Diabetes Management Algorithm" that mentions obesity fifty (50) times; 12 of 19 authors had ties to Novo or Lilly.[103]

---

[97] https://medical.lilly.com/us/science/conferences/obesity.

[98] https://medical.lilly.com/us/science/conferences/obesity/ow2024.

[99] https://assets.ctfassets.net/mpejy6umgthp/13JiVNYXvN7llHOHNRza8j/4c08788f73c6e6caa78a48d6a6c1ea5a/VV-TZPPT1_OW2024_KAN_REAL_WORLD_CHARACTERISTICS_DV-022561_V2.2.pdf.

[100] https://pubmed.ncbi.nlm.nih.gov/20101009/.

[101] https://www.biospace.com/business/lillys-sprawling-obesity-clinical-program-underscores-challenges-for-biotechs.

[102] https://medical.lilly.com/us/diseases/disease-education-resources/obesity/obesity/education-resources/observe-study-overview.

[103] https://diabetesed.net/page/_files/AACE-2013-DM-consensus-statement.pdf (last accessed July 14, 2024).

- In May of 2013, Novo and Lilly, among others, provided grants to a working group's that are publishing with the American Diabetes Association and Endocrine Society.[104] Under the Participants Section, the Abstract says: "The workgroup meeting was supported by educational grants to the American Diabetes Association from Lilly USA, LLC and Novo and sponsorship to the American Diabetes Association from Sanofi. The sponsors had no input into the development of or content of the report."

- Lilly and Novo both paid personal fees to the author of the study "Influence and effects of weight stigmatization in the media."[105] Novo has separately funded the Joint International Consensus Statement for ending the Stigma of Obesity, and Lilly had paid speaker fees to one of the authors.[106] This research concluded that the prevailing view is that "obesity is a choice and that it can be entirely reversed by voluntary decisions to eat less and exercise more" and that this view can "exert negative influences" on access to treatments and research.[107]

- Lilly and Novo continue to partner together on obesity research and expanding obesity treatments.[108] To date these treatments have made Novo nearly $50 Billion in sales of Ozempic and Wegovy since 2018.[109] Mounjaro and Zepbound now account for approximately 40% of Lilly's total sales, which exceed billions of dollars.[110]

111. Medicalizing obesity treatment would do little for Defendants profits if there was no access to GLP-1 RAs. Such access includes the ability to pay for these very expensive drugs. Key to making the GLP-1's more affordable was getting them covered by Medicare. Not only would Medicare coverage make obesity drugs affordable for many people who currently find them

---

[104] Seaquist, *et al.*, *Hypoglycemia and diabetes: a report of a workgroup of the American Diabetes Association and the Endocrine Society*, J. Clin. Endocrinol Metab. (2013 May), 98(5):1845-59. doi: 10.1210/jc.2012-4127. Epub 2013 Apr 15. PMID: 23589524.

[105] https://pmc.ncbi.nlm.nih.gov/articles/PMC9125650/.

[106] https://www.nature.com/articles/s41591-020-0803-x.

[107] https://www.nature.com/articles/s41591-020-0803-x#Sec1.

[108] https://www.imisophia.eu/partners.

[109] https://www.usatoday.com/story/news/health/2024/09/24/senate-hearing-novo-nordisk-ceo-ozempic-wegovy-prices/75348020007/.

[110] https://www.barrons.com/articles/eli-lilly-stock-weight-loss-drugs-market-cap-681cf0f7.

out of reach, it would likely push private insurers to likewise cover these drugs.[111] As Lilly's Mike Mason previously noted, the key to expanding the market for obesity drugs was "unlock[ing]" coverage under Medicare Part D.[112]

112.    Unfortunately for Defendants, drugs used for weight loss were excluded by Congress when it established Medicare's Part D prescription drug benefit in 2003. This ban effectively deprives drugmakers of millions of potential customers.[113]

113.    From 2021 to August of 2024, Lilly spent over $2 Million lobbying for obesity drug coverage:[114] $390,000 (2021); $400,000 (2022); $900,000 (2023); and $320,000 (2024).[115] As reported by the *Associated Press* in December of 2023, "Lilly spent roughly $2.4 million lobbying since 2021" on obesity drug coverage issues, including lobbying related to the Treat & Reduce Obesity Act.[116]

114.    The lobbying activities and contributions referenced above do not include the money that Defendants spend lobbying for inclusion of weight-loss drugs in prescription drug

---

[111] https://www.npr.org/sections/health-shots/2023/08/07/1192279278/ozempic-and-wegovy-maker-courts-prominent-black-leaders-to-get-medicares-favor (last visited Oct. 23, 2024).

[112] Eli Lilly at UBS Global Healthcare Conference (May 24, 2022), https://web.archive.org/web/20220603141033/https://investor.lilly.com/webcasts-and-presentations.

[113] https://www.npr.org/sections/health-shots/2023/08/07/1192279278/ozempic-and-wegovy-maker-courts-prominent-black-leaders-to-get-medicares-favor (last visited Oct. 23, 2024).

[114] OPEN SECRETS, *Eli Lilly & Co*, https://www.opensecrets.org/orgs/eli-lilly-co/lobbying.

[115] *Id*.

[116] Amanda Seitz, *New weight loss drugs are out of reach for millions of older Americans because Medicare won't pay*, ASSOC. PRESS (Dec. 28, 2023), https://apnews.com/article/wegovy-ozempic-zepbound-medicare-obesity-weight-loss-02d4500e737d30d070d70907521a4fe0.

coverage through advocacy groups, such as the Obesity Care Advocacy Network,[117] and direct contributions to political campaigns for members for Congress.[118]

115.    Lilly has also engaged in DTC advertisements. The campaign "Living with Obesity" features a woman talking about how "we've been conditioned to say that people who live in larger bodies are lazy, eating too much. They don't exercise . . . It's just not true."[119] The woman proceeds to talk about how exercise hasn't worked because even if she lost weight, it would "always stop working,"[120] and discusses how the "experts" at the Obesity Action Coalition (an advocacy group funded in part by Lilly) say obesity is a disease that requires pharmaceutical treatment.

116.    Lilly's Chief Customer Officer, Patrik Jonsson, acknowledged in 2022, that the over 100 million people suffering from obesity in the U.S. who were not being treated with pharmaceuticals were a "[v]ery huge opportunity in front of us" before continuing that there was a "lot of work required to *medicalize obesity*."[121]

117.    Mr. Jonsson also discussed other efforts being made to support pharmaceutical intervention as a treatment for obesity including conducting research that would show other health conditions that were improved by weight loss: "And we are currently doing five outcome studies that we believe will have a high relevance in order to *change the treatment landscape* in NASH

---

[117]https://assets.obesitycareadvocacynetwork.com/TROA_fact_sheet_11_12_21_48098432e0/TROA_fact_sheet_11_12_21_48098432e0.pdf (last visited on Sept. 18, 2023).

[118] https://www.fiercepharma.com/marketing/health-group-lambasts-novo-nordisk-60-minutes-paid-news-program-weight-loss-med-wegovy (last visited Sept. 18, 2023).

[119] https://www.youtube.com/watch?v=Vouu1caRu4M (accessed Nov. 7, 2024).

[120] *Id*.

[121] Eli Lilly & Co Conf Presentation Call 2022315.pdf (emphasis added).

and chronic kidney disease (inaudible) and one in morbidity and mortality outcomes study as well, and all those will have the opportunity to really *medicalize be the obesity market*."[122]

118.    Defendants also needed to make sure that there was access to these drugs, which meant that there would need to be insurance coverage. While at the UBS Global Healthcare Conference in May of 2022, Lilly's then-Executive Vice President and President of Diabetes and Obesity Mike Mason made clear that access in the obesity market would depend on the ability to get coverage: "the main driver in the evolution of the obesity market will be access. So you need to unlock [ph] Part D coverage, that's what the Treat and Reduce Obesity Act are trying to do. You also not only need to get access at the payers, but then employers got to opt into that coverage. So that's the most important thing to develop the obesity market."[123]

119.    Lilly knew there were limits to what Medicare would cover for obesity, so it tried to create enough data to show that the GLP-1 RAs could be used to treat other health conditions that were or would more likely be covered by Medicare. As Lilly's Chief Scientific Officer Dan Skovronsky explained during a Goldman Sachs Global Healthcare Conference on September 17, 2022: "in terms of monetizing the opportunity in the Medicare setting because it would seem the bar is high to expect Medicare to reimburse obesity, right? There are *backdoors into increasing usage on the Medicare*, you're exploring sleep apnea, you're exploring NASH."[124]

120.    On May 24, 2022, Lilly's Mike Mason discussed a strategy of offering discounts and samples in order to market Mounjaro: "If patients are able to get access to it, who are able to

---

[122] *Id*.

[123] Eli Lilly & Co Conf Presentation Call 2022524 DN000000002983664779.pdf.

[124] Eli Lilly at Citi's 17th Annual BioPharma Conference (Sep. 7, 2022), https://web.archive.org/web/20221001135415/https://investor.lilly.com/webcasts-and-presentations (emphasis added).

35

have a good start on the medication, that just wonderfully supports your position in the marketplace. . . . [W]e will have a $25 copay cards, so people can get access at affordable price. We're going to be providing month-long samples at 2.5 milligram dose, so that patients can experience the product for a month at 2.5." [125] Lilly took a similar approach with Zepbound where they have offered single dose vials at a 50% discount when fulfilled through their online pharmacy.[126]

121.    These programs allowed patients to get on the GLP-1 RAs without the significant cost barrier that comes with continued use. Of course, once the patient stops using the drug, they gain back the weight.

122.    Lilly, which had been advertising its diabetes medication Trulicity since 2015, began marketing it with an eye toward weight loss in 2018 (it was not approved for weight loss). In its 2018 Trulicity advertising campaign "Do More," an overweight firefighter exclaims, "[Trulicity] comes in an easy-to-use pen, and I may even lose a little weight!"[127] This weight loss messaging continues in a series of advertisements in 2021 and 2022 called "On His Game," "Father-Son," and "My Sister" where the voiceover indicates that taking Trulicity can help you "lose up to 10lbs."[128] These advertisements were even targeted to Spanish speaking populations, proclaiming "puedes perder hasta 10 LBS" in an advertisement from 2022.[129]

---

[125] Eli Lilly & Co. Conf. Presentation Call 2022524 DN000000002983664779.pdf.

[126]    *See*   https://www.ajmc.com/view/eli-lilly-expands-zepbound-access-with-discounted-single-dose-vials-self-pay-options (last accessed Oct. 9, 2024).

[127] https://www.ispot.tv/ad/dBhL/trulicity-do-more-firefighter.

[128] https://www.ispot.tv/ad/Oqgb/trulicity-on-his-game https://www.ispot.tv/ad/q4Kl/trulicity-father-son;  https://www.ispot.tv/ad/bffc/trulicity-my-sister.

[129] https://www.ispot.tv/ad/bKNt/trulicity-reduce-el-azcar-spanish.

123.    On February 13, 2020, Lilly partnered with Team USA and NBC for the Olympics.[130] In addition to partnering specifically with Team USA, Lilly also engaged many Team USA athletes as "brand ambassadors" on marketing health-related issues like diabetes. A Lilly spokesperson said the goal of the marketing campaign was clear: "to connect with Americans that may benefit from our medicines" and adding that "as a global healthcare leader, we can think of no better example of health and wellness than these elite athletes."[131]

124.    In July of 2023, Lilly extended its marketing deal with Team USA and NBC, securing this partnership through the 2028 Olympic Games and Paralympic Games, both of which will be held in Los Angeles.[132] In that same month, Lilly released a television commercial for Mounjaro featuring Simone Biles, one of the most recognizable members of Team USA. The advertisement featured Simone Biles engaging with fans and then saying "you can do diabetes differently, with Mounjaro."[133]

125.    In the run up to the 2024 Olympics in Paris, Simone Biles posted to her Instagram account a Mounjaro commercial in which she starred with her mom. The advertisement noted that she is not a diabetic and that her mom, Nellie, who is a type 2 diabetic, is not taking Mounjaro. The ad further says in a voiceover that "people taking Mounjaro lost up to 25 pounds" while noting

---

[130] *See* https://corporate.comcast.com/press/releases/us-olympic-paralympic-committee-nbcuniversal-eli-lilly-and-company (last accessed October 9, 2024).

[131] *Id.*

[132] Nick Paul Taylor, *Lilly inks expanded Olympics deal, positioning it to push diabetes, cancer messaging through 2028*, Fierce Pharma (Jul. 12, 2023), https://www.fiercepharma.com/marketing/lilly-inks-expanded-olympics-deal-positioning-it-push-diabetes-cancer-messaging-through.

[133] *See* https://www.fiercepharma.com/marketing/eli-lilly-vaults-simone-biles-head-mounjaro-ad-campaign-partnering-olympian-tv-spot (last accessed Oct. 9, 2024).

in text that it is not approved for weight loss. In her comments, Simone Biles states: "It's always so exciting to get to work with my mom, especially on something so personal to us."[134]

126.    On February 12, 2023, Lilly's first TV advertisement for Mounjaro—titled "What If"—aired during the Super Bowl. Lilly spent $19.6 Million on the advertisement. The commercial featured patients pondering the possibility of managing their type 2 diabetes "differently" and included statements that Mounjaro "helps your body regulate blood sugar and can help decrease the amount of food you eat,"[135] and that "people taking Mounjaro lost up to 25 lbs."[136] On a list for pharmaceutical advertising spending for the month, Lilly's "What If" ad ranked 4th.[137]

127.    The net effect of these advertisements was to heighten interest in a medicated solution to weigh-loss, balloon the market for GLP-1 RAs, encourage off-label use for GLP-1 RAs, and to target users of other diabetes medications to switch to GLP-1 RAs even though they never would have switched absent this unprecedented marketing. This expansion of the GLP-1 RA market came without concern for the safety and efficacy of these drugs.

128.    Lilly also engaged in unbranded marketing through online platforms. For example, on October 18, 2024, Lilly announced that it was partnering with the OAC to launch[138] a "bias-free obesity image gallery" as part of the OAC's website, "Stop Weight Bias."[139] The purpose of

---

[134] https://www.instagram.com/simonebiles/?hl=en (last accessed Oct. 9, 2024).

[135] https://xtalks.com/eli-lilly-spends-big-on-first-mounjaro-tv-commercial-for-diabetes-3424/.

[136] https://www.ispot.tv/ad/1VpJ/mounjaro-what-if; https://www.pharmexec.com/view/eli-lilly-invests-heavily-in-debut-mounjaro-tv-ad-campaign-for-diabetes (discussing $19.6 million expenditure).

[137] https://xtalks.com/eli-lilly-spends-big-on-first-mounjaro-tv-commercial-for-diabetes-3424/.

[138] https://www.lilly.com/news/stories/combatting-weight-bias.

[139] https://stopweightbias.com/action/.

this website was to promote pharmaceutical intervention for obesity. Stop Weight Bias requires the user to provide all of their biographical information to access the "bias free image gallery."[140]

129.    At no time did any of Lilly's advertisements – on television, social media, or otherwise – contain any warning that Trulicity can cause NAION and its sequelae.

130.    LillyDirect is comprised of a website which offers "Disease state and healthcare educational information to help empower and support patients on their care journeys" as well as "LillyDirect Pharmacy Solutions, a digital pharmacy for select Lilly medicines powered by third party online pharmacy fulfillment services."[141]

131.    The LillyDirect website also connects patients with "independent" telehealth providers – Form Health and 9amHealth—to facilitate prescriptions.[142]

132.    The American College of Physicians released a statement that the organization "is concerned by the development of websites that enable patients to order prescription medications directly from the drugmaker," adding that the approach "is primarily oriented around the use of telehealth services to prescribe a drugmaker's products."[143]

133.    In an October 21, 2024 letter to Lilly, several U.S. Senators, led by Senator Richard J. Durbin, raised concerns relating to telehealth providers and their potential conflicts of interest.[144]

---

[140] https://stopweightbias.com/image-gallery/.

[141] Lilly Press Release (Jan. 24, 2024) (Lilly Launches End-to-End Digital Healthcare Experience through LillyDirect™), available at https://investor.lilly.com/news-releases/news-release-details/lilly-launches-end-end-digital-healthcare-experience-through.

[142] https://lillydirect.lilly.com/telehealth/obesity.

[143] https://www.nytimes.com/2024/01/05/well/weight-loss-tirzepatide-lilly-telehealth.html (last accessed Oct. 10, 2024).

[144] Letter from Richard J. Durbin, United States Senator, *et al*., to David Ricks, Chair and CEO, Eli Lilly & Company (Oct. 21, 2024), https://www.durbin.senate.gov/imo/media/doc/senate_ltr_eli_lilly_dtc_telehealth_platformpdf.pdf.

For example, the Senators wrote that the "launch of Eli Lilly's telehealth platform raises questions about the nature of Eli Lilly's relationship with its contracted telehealth prescribers." The letter details how in 2022, the Office of Inspector General for the HHS [("OIG")] issued a Special Fraud Alert to notify health care practitioners of the specific risks of schemes involving telehealth platforms. According to the Senators, the "nature of the LillyDirect platform" appears to reflect many aspects detailed in the OIG's warning for potential fraud.

134.    The Senators' letter also questions Lilly's partnership with telehealth provider Form Health, detailing an Instagram post from Form Health labeled "When do you start losing weight on Zepbound?" According to the Senators, the advertisement "appears to promote Eli Lilly's medications and erodes the appearance of independence between the telehealth company and Eli Lilly."

135.    In July of 2025, the Senators investigating direct-to-consumer telehealth platforms issued their Report titled "Big Pharma's New Sales Scheme: Expanding Patient Access or a Virtual Pill Mill? A Direct-to-Consumer Telehealth Platform Investigation" (the "Senate Report").[145] The Senate Report found, among other things:

- the direct-to-consumer telehealth strategy takes already excessive and exorbitant promotional activities and "turbo-charges these promotional activities," Senate Report at 1;

- "drug companies are now advertising a drug and linking a patient to a doctor— ostensibly chosen by the drug company—who can write a prescription for it," *id*.;

- "These new partnerships between manufacturers and paid telehealth companies hold the potential to erode the patient-physician relationship and undermine independent medical judgement, which can leave patients with sub-standard care," *id.* at 2;

---

[145] https://www.durbin.senate.gov/imo/media/doc/DTC%20Investigation%202025.pdf.

- "this arrangement seemingly defaults to a medication-first paradigm. The DTC telehealth arrangement risks glossing over the comprehensive evaluation necessary for high-quality patient care," *id.*;

- "Of patients routed by LillyDirect who visited a tele-provider, 74 percent received a prescription," *id.* at 3;

- "a 9amHealth patient was six times more likely to be prescribed an Eli Lilly medication compared to another brand-name drug, and 66 percent of all Form Health prescriptions issued across all patients were for Eli Lilly medications," *id.*;

- Through its telehealth platforms, Eli Lilly collects information about patients, including the date of the first prescription for all patients receiving Zepbound, as well as the patients' contact information, with consent, and the name of the provider that treated the patients, *id.* at 8;

- At least six health care professionals working for Form Health have received payments from Eli Lilly, "including two who have received a combined 41 payments from Eli Lilly," *id.* at 11;

- "Eli Lilly made 13 payments to a single provider listed on 9amHealth's website. Curiously, 9amHealth has chosen to dedicate four providers specifically to seeing patients under the Eli Lilly contract," *id.* at 4;

- The only pharmaceutical provider for 9amHealth and Form Health was Eli Lilly. "This creates a preferential dynamic that may contribute to inappropriate prescribing," *id.* at 12;

- Posts on Form Health's website "use highly promotional phrasing to describe Eli Lilly's medication, calling it 'in a class of its own' that provides 'unprecedented weight loss effect," *id.*;

- Eli Lilly appears to be filtering results of a search for obesity providers on LillyDirect to steer patients towards its preferred providers, who "may also conduct work for Lilly," *id.*

136. The Senate Report demonstrates how the use of direct-to-consumer telehealth platforms to promote use of Defendants' GLP-RAs contributes to off-label use of these drugs as well as inappropriate prescribing and the overall over-prescribing of these drugs.

137. The Senate Report also describes pharmaceutical companies spending "more than $20 billion annually on marketing directly to health care providers to promote specific brand-name

41

medications[.]" *Id.* at 10. "Studies repeatedly have shown that pharmaceutical industry payments to doctors are associated with increased prescribing of that company's products."

138.   A recent lawsuit filed by the Texas Attorney General goes further, alleging that Eli Lilly "bribe[d] and illegally induc[ed] medical providers to prescribe its most profitable drugs, including Mounjaro and Zepbound[.]"[146]

139.   The Attorney General alleges that "to enhance profits, Eli Lilly offered illegal incentives to medical providers in Texas, including 'free nurses' and reimbursement support services. These inducements were designed to steer providers toward prescribing Eli Lilly's drugs."[147]

140.   Many of these prescriptions were covered by Medicaid, "resulting in millions of dollars in claims to Texas Medicaid that were tainted by Eli Lilly's illegal marketing and quid pro quo arrangements[.]" *Id.*

## F.   DEFENDANTS FAILED TO WARN OF THE SERIOUS RISKS OF THEIR GLP1-RA DRUGS AND DOWNPLAYED THESE RISKS IN THEIR UNPRECEDENTED MARKETING TO HEALTHCARE PROVIDERS AND PATIENTS

141.   As set forth previously in this Complaint, Defendants knew, or should have known, based on preclinical trials, premarket clinical trials, post-market surveillance, and adverse event reports, that there was reasonable evidence of a causal association between the use of GLP-1 RAs and the risk of developing NAION and its sequelae.

142.   Despite this knowledge, Defendants spent hundreds of millions of dollars to

---

[146] Press Release, Texas Attorney General, Attorney General Ken Paxton Sues Big Pharma Drug Manufacturer Eli Lilly for Bribing Providers to Prescribe Its Medications (Aug. 12, 2025), https://www.texasattorneygeneral.gov/news/releases/attorney-general-ken-paxton-sues-big-pharma-drug-manufacturer-eli-lilly-bribing-providers-prescribe.

[147] https://www.texasattorneygeneral.gov/sites/default/files/images/press/Lilly%20Marshall%20Petition%20Filed.pdf (Complaint).

aggressively expand the market for the GLP-1 RAs while misleading users and healthcare providers about the serious dangers of the drugs.

143. Defendants purposefully downplayed, understated and ignored the health hazards and risks associated with using GLP-1 RAs.

144. They deceived healthcare providers and potential GLP-1 RA users by communicating positive information through the press, medical organizations and testimonials from social media influencers while expanding the definition of obesity and downplaying the known adverse and serious health effects of their GLP-1 RA drugs.

145. The FDA's Changes Being Effected ("CBE") process permits pharmaceutical manufacturers to unilaterally update their labels without prior FDA approval, including by adding or strengthening warnings and descriptions of adverse reactions, and by deleting false or misleading claims.

146. Defendants' research into their products put them in a position to become aware, in the post-approval context, of the risks and danger of the use of GLP-1 RAs, including the risks of NAION and its sequelae.

147. Defendants were also obligated under 21 CFR §§310.305 and 314.80 to investigate each adverse event associated with their GLP-1 RAs, and Defendants failed to conduct such investigations reasonably, including by failing to take or record unsuccessful steps to seek additional information regarding serious unexpected adverse drug experiences.

148. Defendants likewise violated 21 CFR § 312.32 through their failure to review all information relevant to the safety of their GLP-1 RAs and report such information to the FDA.

149. As Defendants developed information regarding those risks and dangers after the FDA's initial approval of the original label, Defendants were required to make unilateral changes

under the CBE process to these products' labels in order to warn physicians and consumers of those risks.

150. Defendants failed to warn doctors and consumers of these dangers, including the risk of NAION and its sequelae.

151. Defendants intentionally withheld from or misrepresented to the FDA post-approval information concerning their GLP-1 RAs that was required to be submitted under the Federal Food, Drug, and Cosmetic Act. Had Defendants not withheld or misrepresented such information relating to the risks of GLP-1 RA use to the FDA, the FDA would have recommended that Defendants add warnings relating to the risks of the injuries suffered by Plaintiff.

152. Despite developing this knowledge, Defendants did not disclose these risks and/or intentionally downplayed these risks in their labelling, promotion materials, marketing, advertising, and other public facing communications. Defendants' failure to disclose and/or intentional downplaying of these conditions prevented patients and doctors from taking appropriate precautions to reduce or mitigate the risk of these conditions. Defendants' failure deprived patients, like Plaintiff, and doctors, like Plaintiff's physicians, from having the full information necessary to weigh the risks and benefits of taking the Defendants' GLP-1 RAs.

1. **The Sponsor of a Drug is Responsible for Ensuring the Safety of Its Drug and for Warning Healthcare Providers and Patients of the Risks**

153. The Sponsor of a drug is responsible for the safety of its product.

154. A drug company is responsible for alerting healthcare providers and patients of risks that are unknown or not well understood.

155. The Institute of Medicine has stated that FDA's ability to oversee drug safety is limited, especially after approval of a drug.

156. The Institute of Medicine wrote in a report entitled *The Future of Drug Safety: Promoting and Protecting the Health of the Public*: "The drug safety system is impaired by the following factors: serious resource constraints that weaken the quality and quantity of the science that is brought to bear on drug safety; an organizational culture in CDER (FDA Center for Drug Evaluation and Research) that is not optimally functional; and unclear and insufficient regulatory authorities particularly with respect to enforcement." The Report further stated that "FDA, contrary to its public health mission, and the pharmaceutical industry, contrary to its responsibility to the users of its products (and its shareholders), do not consistently demonstrate accountability and transparency to the public by communicating safety concerns in a timely and effective fashion."

157. The FDA has insufficient resources to monitor the 11,000 drugs on the market.

158. At the same time, manufacturers have access to information about their drugs, especially in the post-approval phase as new risks emerge, that is superior to the access that FDA has.

159. Uncommon risks or those that appear as common conditions, develop after long periods of time or have adverse impacts on special populations may go undetected in clinical trials.

160. If a drug company has reason to know the risks of a drug may result in adverse events, even if it develops that knowledge in the post-approval context, that company has a responsibility to investigate those risks and to provide necessary information healthcare providers. FDA standards govern a manufacturer's duty to warn.

161. Warnings and precautions: "This section must describe clinically significant adverse reactions . . . the labeling must be revised to include a warning about a clinically significant

45

hazard as soon as there is reasonable evidence of a causal association of a serious hazard with a drug; a causal relationship need not have been definitely established."[148]

162.    In addition, the Warning and Precaution Section of prescription drug labels must "describe clinically significant adverse reactions (including any that are potentially fatal, are serious even if infrequent, or can be prevented or mitigated through appropriate use of the drug), other potential safety hazards."[149]

163.    A central premise of federal drug regulation is that the manufacturer bears responsibility for the content of its label at all times.

164.    A manufacturer is charged both with crafting an adequate label and with ensuring that its warnings remain adequate as long as the drug is on the market.

165.    FDA's 2011 Guidance on Warnings in labeling advises: The WARNINGS AND PRECAUTION section is intended to identify and describe a discrete set of adverse reactions and other potential safety hazards that are serious or otherwise clinically significant because they have implications for prescribing decisions or for patient management."

166.    FDA's Guidance also states: "Adverse reactions that do not meet the definition of a serious adverse reaction, but are otherwise clinically significant because they have implications for prescribing decisions or patient management, should also be included in the WARNINGS AND PRECAUTIONS section."

### 2.    The Labels for Trulicity Were Inadequate at All Relevant Times From Launch to Present

167.    At all relevant times, the "Warnings and Precautions" sections of the Prescribing Information for Trulicity omitted and continue to omit any "Warnings and Precautions"

---

[148] 21 C.F.R. § 201.57(c)(6).
[149] *Id.*

concerning NAION, the potential for emergent care, hospitalization, long term treatment or permanent vision loss.

168. As discussed above, peer-reviewed medical literature and FDA Adverse Event Reports demonstrate the risk of NAION and its sequelae with GLP1-RA drugs, including Trulicity.

169. At all relevant times, Defendants did not fully inform the FDA about the justification for the warnings set forth above and required by state law.

170. At all relevant times, Defendants failed to reevaluate and re-assess the risks of NAION in light of newly available information.

171. At all relevant times, Defendants failed to disclose information regarding the serious risks of NAION with Trulicity.

172. At all relevant times, Defendants failed to evaluate safety data in their possession and reassess such data in light of newly acquired information.

173. Had Defendants affirmatively and specifically presented such safety information regarding the risk of NAION with Trulicity to FDA, FDA would have permitted Defendants to add the risk of NAION to the labels of Trulicity.

174. This failure to adequately warn patients and healthcare providers has caused or substantially contributed to physical injury and emotional suffering, and permanent vision loss.

175. This failure to adequately warn patients and healthcare providers also made Defendants' GLP-1RA drugs, including those taken by Plaintiff, unreasonably dangerous.

176. Upon information and belief, as a result of Defendants' inadequate warnings, the medical community at large, and Plaintiff's prescribing physicians in particular, were not aware that Trulicity can cause NAION and its sequelae.

177. Upon information and belief, had Defendants adequately warned Plaintiff's

prescribing physicians that Trulicity is causally associated with NAION and its sequelae, then the physicians' prescribing decisions would have changed.

178.    By reason of the foregoing acts and omissions, Plaintiff was and still is caused to suffer from NAION and its sequelae, which resulted in severe and debilitating personal injuries which are permanent and lasting in nature, physical pain, and mental anguish, including diminished enjoyment of life, as well as the need for lifelong medical treatment, monitoring and/or medications, and fear of developing any of the above-named health consequences and/or dying.

## G.    DEFENDANTS' MARKETING OF GLP-1 RAS WAS INTENTIONALLY DECEPTIVE AND MISLEADING AND LACKED FAIR BALANCE

179.    Defendants' extensive multifaceted advertising, marketing and promotion of GLP-1 RAs discussed at length above consistently highlighted and overstated the weight loss benefits of taking a GLP-1 RA while failing to disclose the risks identified with those drugs and concealing other information that would be material to any plaintiff and their physician in weighing the risks and benefits of taking a GLP-1 RA, including Trulicity.

180.    Defendants did not disclose and/or minimize the risks of developing NAION and its sequelae.

181.    In addition, Defendants intentionally omitted other facts that they knew to be true from all of their labels, physician communications, marketing, website, public statements, and other public facing communications. These include the fact that: (1) the average person only loses a small percentage of their body weight while on a GLP-1 RA; (2) GLP-1 RAs are not effective for everyone; (3) patients gain the weight back when they stop taking the GLP-1 RA (*i.e.*, patients have to stay on the drug forever); (4) the weight loss achieved while on a GLP-1 RA is not a healthy weight loss; (5) when a patient regains the weight loss achieved while on a GLP-1 RA, they are typically less healthy than when they began the medication; and (6) many people stop

taking a GLP-1 RA relatively quickly because of trouble tolerating the drugs. These facts are critical to the balancing of risks and benefits facing most patients.

182.    ***Patients Must Remain on the Drug to Sustain Weight Loss***. For those who lose weight, they typically need to stay on the drug forever to maintain the weight loss.[150] A Medscape article from March of 2024 explains that when "patients stop taking GLP-1s, they tend to regain most of that weight within a year, studies showed."[151]

183.    ***Not a Healthy Weight Loss***. Patients taking GLP-1RAs for weight loss may become less healthy. Defendants fully understand that overall health is more than a number, whether that number is purely weight or BMI. Despite this, the focus of prescribing GLP-1 RAs for obesity is on a person's BMI and to the extent that BMI is less than 30, whether they also have a weight-related health condition (*i.e.,* cardiovascular disease, etc.).

184.    As previously noted, BMI is a simple calculation that includes only weight and height. This poses limitations for its usefulness on an individual basis, rather than a population basis. For example, Jalen Hurts, Quarterback of the Philadelphia Eagles, is 6 feet and 1 inch tall and weighs 223 lbs., putting his BMI at 29.4 and making him extremely overweight and borderline obese. This does not account for the fact that he is an elite athlete with a body fat percentage under 10 percent, a true measure of obesity and overall health. Nonetheless, if he has an additional health condition or gains 5 pounds (or simply says he weighs 5 pounds more during a telehealth visit),

---

[150] Melinda Karth, *Is Semaglutide a Miracle Weight-Loss Drug?*, PSYCHOLOGY TODAY (April 1, 2023), https://www.psychologytoday.com/ie/blog/the-neuroscience-of-eating-disorders/202303/ozempic-and-wegovy-is-semaglutide-a-miracle-weight.

[151] Julie Stewart, *Help Patients Prevent Weight Gain After Stopping GLP-1s*, Medscape Med. News (Mar. 18, 2024), https://www.medscape.com/viewarticle/help-patients-prevent-weight-gain-after-stopping-glp-1s-2024a10004z9?form=fpf; *see also* https://www.medscape.com/viewarticle/help-patients-prevent-weight-gain-after-stopping-glp-1s-2024a10004z9?form=fpf.

this NFL Quarterback qualifies for one of the Defendants' weight loss drugs.

185.    Because of the obvious shortcomings of BMI, the AMA has urged doctors to deemphasize their use of BMI in determining healthy weights for patients.[152] On June 14, 2023, the AMA adopted a new policy clarifying how BMI should be used as a measure in medicine.[153] The AMA suggests that BMI be used in conjunction with other valid measures of risk such as, but not limited to, measurements of visceral fat, body adiposity index, body composition, relative fat mass, waist circumference and genetic/metabolic factors.[154]

186.    The *Lancet* Journal similarly established a commission to evaluate the proper role of BMI in clinical treatment. The Comission ultimately recommended that "that BMI should be used only as a surrogate measure of health risk at a population level, for epidemiological studies, or for screening purposes, rather than as an individual measure of health" because "BMI-based metrics of obesity can misclassify excess adiposity and could both underdiagnose and overdiagnose disease."[155]

187.    Weight loss as the sole indicator of health has also been rejected by many clinicians in favor of improvements in other health outcomes and the assessing the whole health of an individual.[156] These clinicians have cautioned that "a lower body weight does not always mean a

---

[152] *Id*.

[153] AMERICAN MEDICAL ASSOCIATION, AMA ADOPTS NEW POLICY CLARIFYING ROLE OF BMI AS A MEASURE IN MEDICINE (June 14, 2023), https://www.ama-assn.org/press-center/press-releases/ama-adopts-new-policy-clarifying-role-bmi-measure-medicine.
[154] *Id.*

[155] Francesca Rubino et al, The Lancet Diabetes & Endocrinology Commission, *Definition and Diagnostic Criteria of Clinical Obesity*, 13 LANCET DIABETES & ENDOCRINOLOGY 221 (2025).

[156] Scott Hagan & Karin Nelson, *Are Current Guidelines Perpetuating Weight Stigma? A Weight-Skeptical Approach to the Care of Patients with Obesity*, 38 J. GEN. INTERN. MED. 793 (2022); *Why body mass index doesn't give the whole health picture*, UNIVERSITY OF WASHINGTON (June 20, 2023), https://newsroom.uw.edu/video-library/why-body-mass-index-doesnt-give-the-whole-health-picture.

person is healthier."[157] In many instances, when someone loses weight, they lose fat (a good result) and also lose muscle mass (a bad result).

188.    The medical community recognizes that weight loss achieved by Ozempic and Wegovy is often a result of a significant loss of muscle mass.[158] As a result, individuals may be lighter than they were initially but have a higher percentage of body fat.[159]

189.    To further exacerbate the problem, if patients stop taking a GLP-1 RA and gain the weight back, as discussed above, that weight gain is typically not adding muscle but instead adding fat. Therefore, the resulting "new you" is less healthy—weighing the same but having a higher percentage of body fat.

190.    The loss of too much muscle mass can lead to sarcopenia, a condition called being "skinny fat," in which the patient has decreased muscle mass, lessened bone density, and lower resting metabolic rate—all of which results in a loss of strength and functionality.[160]

191.    Defendants do not warn about the dangers of the type of unhealthy weight loss occurring with GLP-1 RAs.  Because Defendants do not warn of or disclose the type of weight loss occurring with GLP-1 RAs, patients do not factor that into their analysis of risks and benefits when considering taking a GLP-1 RA and are not aware that they should take specific steps to

---

[157] Cathy Cassata, *Ozempic Can Cause Major Loss of Muscle Mass and Reduce Bone Density*, HEALTHLINE (May 2, 2023), https://www.healthline.com/health-news/ozempic-muscle-mass-loss.

[158] Kaitlin Sullivan, *Weight loss drugs can lead to muscle loss, too. Is that a bad thing?*, (May 20, 2023), https://www.nbcnews.com/health/health-news/weight-loss-drugs-muscle-loss-rcna84936.

[159] Jill Margo, *The alarming twist when using Ozempic for weight loss*, FINANCIAL REVIEW (July 21, 2023), https://www.afr.com/policy/health-and-education/lighter-but-fatter-the-ozempic-paradox-20230718-p5dp5w.

[160] Cathy Cassata, *Ozempic Can Cause Major Loss of Muscle Mass and Reduce Bone Density*, HEALTHLINE (May 2, 2023), https://www.healthline.com/health-news/ozempic-muscle-mass-loss.

mitigate this muscle loss, like dietary changes and strength training.[161]

192.    ***Many Patients Do Not Stay on the Drugs Long Enough to See Benefits.*** Approximately 58% of patients stop taking a GLP-1 RA by 12 weeks, and 30 percent stop in the first 4 weeks. In May of 2024, Blue Cross Blue Shield published "Real-World Trends in GLP-1 Treatment Persistence and Prescribing for Weight Management" noting these statistics.[162] This means that "[the] value [GLP-1 RA treatment] is not likely to be realized" in most patients.[163]

193.    This is perhaps caused by the fact that side effects are most likely to present themselves in the first 12 weeks of use as the dosage increases. Physicians recognize that adverse events are more likely to occur during dose escalation with Ozempic and Wegovy.[164]

194.    Eli Lilly does not warn or highlight that most people are unable to tolerate the drug and stay on it long enough for it to make a meaningful difference. These are clear indications that could impact a patient's decision to take a GLP-1 RA.

### EQUITABLE TOLLING OF STATUTES OF LIMITATIONS

195.    Defendants are estopped from relying on the statute of limitations defense because Defendants actively concealed information concerning known risks, side effects, and defects in Trulicity.  Instead of revealing such information to the FDA or the public, Defendants have continued to represent Trulicity as safe for its intended use.

---

[161] Jill Margo, *The alarming twist when using Ozempic for weight loss*, FINANCIAL REVIEW (July 21, 2023), https://www.afr.com/policy/health-and-education/lighter-but-fatter-the-ozempic-paradox-20230718-p5dp5w.

[162] BLUE HEALTH INTELLIGENCE, REAL-WORLD TRENDS IN GLP-1 TREATMENT PERSISTENCE AND PRESCRIBING FOR WEIGHT MANAGEMENT, (May 2024), https://www.bcbs.com/media/pdf/BHI_Issue_Brief_GLP1_Trends.pdf.

[163] Patrick Gleason et al., *Real-world persistence and adherence to glucagon-like peptide-1 receptor agonists among obese commercially insured adults without diabetes,* 30 JMCP 2 (2024).

[164] *See, e.g.,* Natasha Chidekel Bergmann et al, *Semaglutide for the treatment of overweight and obesity: A review*, 25 DIABETES, OBESITY AND METABOLISM 1, 29 (2023).

196.    Defendants are and were under a continuing duty to disclose the true character, quality and nature of risks and dangers associated with Trulicity.  Because of Defendants' purposeful and fraudulent concealment of material information concerning the true character, quality and nature of risks of such products, Defendants are estopped from relying on any statute of limitations defense.

## CAUSES OF ACTION

### COUNT I
### FAILURE TO WARN - NEGLIGENCE
### (AGAINST ALL DEFENDANTS)

197.    Plaintiff incorporates by reference each preceding and succeeding paragraph as though set forth fully at length herein.

198.    Defendants had a duty to exercise reasonable care in designing, researching, testing, manufacturing, marketing, supplying, promotion, advertising, packaging, labeling, sale and/or distribution of Trulicity into the stream of commerce, including a duty to assure Trulicity would not cause users to suffer unreasonable, dangerous side effects.

199.    At all relevant times, Defendants failed to exercise ordinary care in the design, research, testing, manufacture, labeling, warnings, marketing, promotion, quality assurance, quality control, sale and/or distribution of Trulicity in that Defendants knew or should have known that the drug could proximately cause Plaintiff's injuries and/or presented an unreasonably high risk of injuries.

200.    Defendants' Trulicity was expected to and did reach the usual users and/or consumers, handlers, and persons coming into contact with said products without substantial change in the condition in which it was produced, manufactured, sold, distributed, and marketed by Defendants.

201. At all relevant times, and at the times Trulicity left Defendants' control, Defendants knew or should have known that Trulicity was unreasonably dangerous because it did not adequately warn of the increased risks of NAION and its sequelae.

202. Despite the fact that Defendants knew or should have known that Trulicity caused unreasonably dangerous injuries, Defendants continued to market, distribute, and/or sell Trulicity to consumers, including Plaintiff, without adequate warnings.

203. Despite the fact that Defendants knew or should have known that Trulicity caused unreasonably dangerous injuries, Defendants continued to market Trulicity to prescribing physicians, including Plaintiff's prescribing physicians, without adequate warnings.

204. Defendants knew or should have known that consumers such as Plaintiff would foreseeably suffer injuries as a result of their failure to provide adequate warnings, as set forth herein.

205. At all relevant times, given its increased safety risks, Trulicity was not fit for the ordinary purposes for which it was intended.

206. At all relevant times, given their increased safety risks, Trulicity did not meet the reasonable expectations of an ordinary consumer, particularly Plaintiff.

207. Defendants had a duty to exercise reasonable care in the designing, researching, testing, manufacturing, marketing, supplying, promotion, advertising, packaging, labeling, sale and/or distribution of Trulicity into the stream of commerce, including a duty to assure that the product would not cause users to suffer unreasonable, dangerous injuries, such as NAION and its sequelae.

208. At all relevant times, Plaintiff was using Trulicity for the purposes and in a manner normally intended.

54

209. The Trulicity designed, researched, manufactured, tested, advertised, promoted, marketed, sold, and distributed by Defendants were defective due to inadequate warnings or instructions, as Defendants knew or should have known that this product created a risk of serious and dangerous injuries, including the increased risk of NAION and its sequelae, as well as other severe and debilitating personal injuries which are permanent and lasting in nature, and Defendants failed to adequately warn of said risks.

210. The Trulicity designed, researched, manufactured, tested, advertised, promoted, marketed, sold, and distributed by Defendants was defective due to inadequate post-marketing surveillance and/or warnings because, after Defendants knew or should have known of the risks of serious side effects, including the increased risks of NAION and its sequelae, as well as other severe, debilitating and permanent health consequences from Trulicity, they failed to provide adequate warnings to users and/or prescribers of this product, and continued to improperly advertise, market and/or promote the product.

211. At all relevant times, the labels for Trulicity were inadequate because they did not warn and/or adequately warn of all possible adverse side effects causally associated with the use of Trulicity, including the increased risk of NAION and its sequelae.

212. At all relevant times, the labels for Trulicity were inadequate because they did not warn and/or adequately warn that Trulicity had not been sufficiently and/or adequately tested for safety risks, including the increased risk of NAION and its sequelae.

213. At all relevant times, the labels for Trulicity were inadequate because they did not warn and/or adequately warn of all possible adverse side effects concerning the failure and/or malfunction of Trulicity.

214. At all relevant times, the labels for Trulicity were inadequate because they did not warn and/or adequately warn of the severity and duration of adverse effects, as the warnings given did not accurately reflect the symptoms or severity of the side effects.

215. Communications made by Defendants to Plaintiff and Plaintiff's prescribing physicians were inadequate because Defendants failed to warn and/or adequately warn of all possible adverse side effects causally associated with the use of Trulicity, including the increased risk of NAION and its sequelae.

216. Communications made by Defendants to Plaintiff and Plaintiff's prescribing physicians were inadequate because Defendants failed to warn and/or adequately warn that their Trulicity had not been sufficiently and/or adequately tested for safety risks, including the increased risks of NAION and its sequelae.

217. Plaintiff had no way to determine the truth behind the inadequacies of Defendants' warnings as identified herein, and Plaintiff's reliance upon Defendants' warnings was reasonable.

218. Plaintiff's prescribing physicians had no way to determine the truth behind the inadequacies of Defendants' warnings as identified herein, and Plaintiff's prescribing physicians' reliance upon Defendants' warnings was reasonable.

219. Upon information and belief, had Plaintiff's prescribing physicians been warned of the increased risk of NAION and its sequelae, which has reasonable evidence of a causal association with Trulicity, then the prescribing physicians would not have prescribed Trulicity and/or would have provided Plaintiff with adequate warnings regarding the dangers Trulicity so as to allow Plaintiff to make an informed decision regarding his use of Trulicity.

220. Upon information and belief, had Plaintiff's prescribing physicians been warned that Trulicity had not been sufficiently and/or adequately tested for safety risks, including the

56

increased risks of NAION and its sequelae, the prescribing physicians would not have prescribed Trulicity and/or would have provided Plaintiff with adequate warnings regarding the lack of sufficient and/or adequate testing of Trulicity so as to allow Plaintiff to make an informed decision regarding his use of Trulicity.

221. If Plaintiff had been warned of the increased risk of NAION and its sequelae, which has reasonable evidence of a causal association with Trulicity, then Plaintiff would not have used Trulicity and/or suffered from NAION and its sequelae.

222. If Plaintiff had been warned that Trulicity had not been sufficiently and/or adequately tested for safety risks, including the increased risks of NAION and its sequelae, then Plaintiff would not have used Trulicity and/or suffered from NAION and its sequelae.

223. If Plaintiff had been warned of the increased risk of NAION and its sequelae, which has reasonable evidence of a causal association with Trulicity, then Plaintiff would have informed their prescribers that they did not want to take Trulicity.

224. Upon information and belief, if Plaintiff had informed their prescribing physicians that they did not want to take Trulicity due to the increased risks of NAION and its sequelae, or the lack of adequate testing for safety risks, then Plaintiff's prescribing physicians would not have prescribed Trulicity.

225. By reason of the foregoing, Defendants have become liable to Plaintiff for the designing, marketing, promoting, distribution and/or selling of their unreasonably dangerous Trulicity.

226. Defendants designed, researched, manufactured, tested, advertised, promoted, marketed, sold, and distributed defective product which created an unreasonable risk to the health

of consumers and to Plaintiff in particular, and Defendants are therefore liable for the injuries sustained by Plaintiff.

227.    Defendants' inadequate warnings for Trulicity were acts that amount to willful, wanton, and/or reckless conduct by Defendants.

228.    Said inadequate warnings for Trulicity were a substantial factor in causing Plaintiff's injuries.

229.    As a direct and proximate result of one or more of the foregoing acts and omissions, Plaintiff was caused to suffer serious and dangerous injuries, including NAION and its sequelae, which resulted in other severe and personal injuries which are permanent and lasting in nature, including physical pain, mental anguish, diminished enjoyment of life, as well as the need for lifelong medical treatment, monitoring and/or medications, and fear of developing any of the above-named health consequences.

230.    As a direct and proximate result of one or more of the foregoing acts and omissions, Plaintiff also suffered consequent economic and other losses, including pain and suffering, loss of a normal life, medical expenses, lost income and disability, and punitive damages. Plaintiff is informed and believes and further alleges that he will require future medical and/or hospital care, attention, and services.

**WHEREFORE**, Plaintiff demands judgment against Defendants for compensatory, treble and punitive damages, together with interest, costs of suit, attorneys' fees and all such other relief as the Court deems proper.

**COUNT II**
**<u>FAILURE TO WARN – STRICT LIABILITY</u>**
**<u>(AGAINST ALL DEFENDANTS)</u>**

231.    Plaintiff incorporates by reference each preceding and succeeding paragraph as though set forth fully at length herein.

58

232.    West Virginia law imposes a duty on producers, manufacturers, distributors, lessors, and sellers of a product to exercise all reasonable care when designing, researching, manufacturing, producing, distributing, leasing, and selling their products.

233.    At all relevant times, Defendants designed, researched, manufactured, produced, tested, advertised, promoted, marketed, sold, and/or distributed the Trulicity that Plaintiff used.

234.    Trulicity was expected to and did reach the usual consumers, handlers, and persons coming into contact with said products without substantial change in the condition in which it was produced, manufactured, sold, distributed, and marketed by Defendants.

235.    At all relevant times, and at the times Trulicity left Defendants' control, Defendants knew or should have known that Trulicity was unreasonably dangerous because it did not adequately warn of the risks of NAION and its sequelae, especially when used in the form and manner as provided by Defendants.

236.    Despite the fact that Defendants knew or should have known that there was reasonable evidence of a causal association with unreasonably dangerous injuries, including NAION and its sequelae, Defendants continued to market, distribute, and/or sell Trulicity to consumers, including Plaintiff, without adequate warnings.

237.    Despite the fact that Defendants knew or should have known that there was reasonable evidence of a causal association with unreasonably dangerous injuries, including NAION and its sequelae, Defendants continued to market Trulicity to prescribing physicians, including Plaintiff's prescribing physicians, without adequate warnings.

238.    Defendants knew or should have known that consumers such as Plaintiff would foreseeably suffer injury as a result of their failure to provide adequate warnings, as set forth herein.

59

239. At all relevant times, given its increased safety risks, Trulicity was not fit for the ordinary purposes for which it was intended.

240. At all relevant times, given its increased safety risks, Trulicity did not meet the reasonable expectations of an ordinary consumer, particularly Plaintiff.

241. Defendants had a duty to exercise reasonable care in the designing, researching, testing, manufacturing, marketing, supplying, promotion, advertising, packaging, labeling, sale, and/or distribution of Trulicity into the stream of commerce, including a duty to assure that the product would not cause users to suffer unreasonable, dangerous injuries, such as NAION and its sequelae.

242. At all relevant times, Plaintiff was using Trulicity for the purposes and in a manner normally intended.

243. The Trulicity designed, researched, manufactured, tested, advertised, promoted, marketed, sold, and distributed by Defendants was defective due to inadequate warnings or instructions, as Defendants knew or should have known that this product created a risk of serious and dangerous injuries, including NAION and its sequelae, as well as other severe and debilitating personal injuries which are permanent and lasting in nature, and Defendants failed to adequately warn of said risks.

244. At all relevant times, the labels for Trulicity were inadequate because they did not warn and/or adequately warn of all possible adverse side effects for which there is reasonable evidence of a causal association with the use of Trulicity, including the increased risk of NAION and its sequelae.

245. At all relevant times, the labels for Trulicity were inadequate because they did not warn and/or adequately warn that Trulicity had not been sufficiently and/or adequately tested for safety risks, including the increased risk of NAION and its sequelae.

246. At all relevant times, the labels for Trulicity were inadequate because they did not warn and/or adequately warn of all possible adverse side effects concerning the failure and/or malfunction of the Trulicity.

247. At all relevant times, the labels for Trulicity were inadequate because they did not warn and/or adequately warn of the severity and duration of adverse effects, as the warnings given did not accurately reflect the symptoms or severity of the side effects.

248. Communications made by Defendants to Plaintiff and Plaintiff's prescribing physicians were inadequate because Defendants failed to warn and/or adequately warn of all possible adverse side effects with reasonable evidence of a causal association with the use of Trulicity, including the increased risk of NAION and its sequelae.

249. Communications made by Defendants to Plaintiff and Plaintiff's prescribing physicians were inadequate because Defendants failed to warn and/or adequately warn that Trulicity had not been sufficiently and/or adequately tested for safety risks, including the increased risk of NAION and its sequelae.

250. Plaintiff had no way to determine the truth behind the inadequacies of Defendants' warnings as identified herein, and Plaintiff's reliance upon Defendants' warnings was reasonable.

251. Plaintiff's prescribing physicians had no way to determine the truth behind the inadequacies of Defendants' warnings as identified herein, and Plaintiff's prescribing physicians' reliance upon Defendants' warnings was reasonable.

252.    Upon information and belief, had Plaintiff's prescribing physicians been warned of the increased risk of NAION and its sequelae, for which there is reasonable evidence of a causal association with Trulicity, then the prescribing physicians would not have prescribed Trulicity, and/or would have provided Plaintiff with adequate warnings regarding the dangers of Trulicity, so as to allow Plaintiff to make an informed decision regarding his use of Trulicity.

253.    Upon information and belief, had Plaintiff's prescribing physicians been warned that Trulicity had not been sufficiently and/or adequately tested for safety risks, including the increased risk of NAION and its sequelae, the prescribing physicians would not have prescribed Trulicity, and/or would have provided Plaintiff with adequate warnings regarding the lack of sufficient and/or adequate testing of Trulicity, so as to allow Plaintiff to make an informed decision regarding his use of Trulicity.

254.    If Plaintiff had been warned of the increased risks of NAION and its sequelae, for which there is reasonable evidence of a causal association with Trulicity, then Plaintiff would not have used Trulicity, and/or suffered from NAION and its sequelae.

255.    If Plaintiff had been warned that Trulicity had not been sufficiently and/or adequately tested for safety risks, including the increased risks of NAION and its sequelae, then Plaintiff would not have used Trulicity and/or suffered from NAION and its sequelae

256.    If Plaintiff had been warned of the increased risk of NAION and its sequelae, for which there is reasonable evidence of a causal association with Trulicity, then Plaintiff would have informed Plaintiff's prescribing physicians that he did not want to use Trulicity.

257.    Upon information and belief, if Plaintiff had informed his prescribing physicians that he did not want to use Trulicity due to the risk of NAION and its sequelae, or the lack of

adequate testing for safety risks, then Plaintiff's prescribing physicians would not have prescribed Trulicity.

258. By reason of the foregoing, Defendants have become liable to Plaintiff for the designing, marketing, promoting, distribution and/or selling of Defendants' unreasonably dangerous Trulicity.

259. Defendants designed, researched, manufactured, tested, advertised, promoted, marketed, sold, and distributed a defective product which created an unreasonable risk to the health of consumers and to Plaintiff in particular, and Defendants are therefore liable for the injuries sustained by Plaintiff.

260. Defendants' inadequate warnings for Trulicity were acts that amount to willful, wanton, and/or reckless conduct by Defendants.

261. Said inadequate warnings for Trulicity were a substantial factor in causing Plaintiff's injuries.

262. As a direct and proximate result of one or more of the foregoing acts and omissions, Plaintiff was caused to suffer serious and dangerous injuries, including NAION and its sequelae, which resulted in other severe and personal injuries which are permanent and lasting in nature, including physical pain, mental anguish, diminished enjoyment of life, as well as the need for lifelong medical treatment, monitoring and/or medications, and fear of developing any of the above-named health consequences.

263. As a direct and proximate result of one or more of the foregoing acts and omissions, Plaintiff also suffered consequent economic and other losses, including pain and suffering, loss of a normal life, medical expenses, lost income and disability, and punitive damages. Plaintiff is

63

informed and believes and further alleges that he will require future medical and/or hospital care, attention, and services.

WHEREFORE, Plaintiff demands judgment against Defendants for compensatory, treble and punitive damages, together with interest, costs of suit, attorneys' fees and all such other relief as the Court deems proper.

## COUNT III
## BREACH OF EXPRESS WARRANTY /
## FAILURE TO CONFORM TO REPRESENTATIONS
## (AGAINST ALL DEFENDANTS)

264. Plaintiff incorporates by reference each preceding and succeeding paragraph as though set forth fully at length herein.

265. At all relevant times, Defendants designed, researched, manufactured, tested, advertised, promoted, marketed, sold, and/or distributed the Trulicity that Plaintiff used.

266. At all relevant times, Defendants expressly represented to Plaintiff and Plaintiff's prescribing physicians that Trulicity was safe as an adjunct to diet and exercise to improve glycemic control and to reduce cardiovascular risks in adults with type 2 diabetes mellitus, and/or to aid in chronic weight management.

267. The aforementioned express representations were made to Plaintiff and Plaintiff's prescribing physicians by way of Trulicity's labels, websites, advertisements, promotional materials, and through other statements.

268. As a result of Defendants' express representations, Plaintiff's prescribing physicians were induced to prescribe Trulicity to Plaintiff, and Plaintiff was induced to use Trulicity.

269. At all relevant times, Defendants reasonably anticipated and expected that individuals, such as Plaintiff, would use and/or consume Trulicity based upon their express representations.

270. At all relevant times, Defendants reasonably anticipated and expected that prescribing physicians, such as Plaintiff's prescribing physicians, would recommend, prescribe and/or dispense Trulicity based upon their express representations.

271. At all relevant times, Defendants knew or should have known that Trulicity wsd unreasonably dangerous because of their increased risks of NAION and its sequelae, especially when the drug was used in the form and manner as provided by Defendants.

272. At all relevant times, Defendants knew or should have known that Trulicity had not been sufficiently and/or adequately tested for safety.

273. The unreasonably dangerous characteristics of Trulicity were beyond that which would be contemplated by the ordinary user, such as Plaintiff, with the ordinary knowledge common to the public as to the drug's characteristics.

274. The unreasonably dangerous characteristics of Trulicity were beyond that which would be contemplated by Plaintiff's prescribing physicians, with the ordinary knowledge common to prescribing physicians as to the drug's characteristics.

275. At the time Trulicity left Defendants' control, Trulicity did not conform to Defendants' express representations because Trulicity was not safe to use as an adjunct to diet and exercise to improve glycemic control and to reduce cardiovascular risks in adults with type 2 diabetes, and/or to aid in chronic weight management, in that the drug was causally associated with increased risks of NAION and its sequelae.

65

276. The express representations made by Defendants regarding the safety of Trulicity were made with the intent to induce Plaintiff to use the products and/or Plaintiff's prescribing physicians to prescribe the products.

277. Defendants knew and/or should have known that by making the express representations to Plaintiff and/or Plaintiff's prescribing physicians, it would be the natural tendency of Plaintiff to use Trulicity and/or the natural tendency of Plaintiff's prescribing physicians to prescribe Trulicity.

278. Plaintiff and Plaintiff's prescribing physicians, as well as members of the medical community, relied on the express representations of Defendants identified herein.

279. Had Defendants not made these express representations, Plaintiff would not have used Trulicity and/or, upon information and belief, Plaintiff's prescribing physicians would have altered their prescribing practices and/or would have provided Plaintiff with adequate warnings regarding the dangers of Trulicity so as to allow Plaintiff to make an informed decision regarding their use of Trulicity.

280. Had Plaintiff been warned of the increased risk of NAION and its sequelae causally associated with Trulicity, Plaintiff would not have used Trulicity and and/or suffered from NAION and its sequelae.

281. Had Plaintiff been warned that Trulicity had not been sufficiently and/or adequately tested for safety risks, including NAION and its sequelae, Plaintiff would not have used Trulicity and/or suffered from NAION and its sequelae.

282. Accordingly, Defendants are liable as a result of their breach of express warranties to Plaintiff.

66

283. Defendants' breaches of express warranties were a substantial factor in causing Plaintiff's injuries.

284. Plaintiff's injuries and damages arose from a reasonably anticipated use of Trulicity by Plaintiff.

285. As a direct and proximate result of one or more of the foregoing breaches, Plaintiff was caused to suffer serious and dangerous injuries including NAION and its sequelae, as well as other severe and debilitating personal injuries which are permanent and lasting in nature, including physical pain, mental anguish, including diminished enjoyment of life, as well as the need for lifelong medical treatment, monitoring and/or medications, and fear of developing any of the above-named health consequences.

286. As a direct and proximate result of one or more of the foregoing acts and omissions, Plaintiff also suffered consequent economic and other losses, including pain and suffering, loss of a normal life, medical expenses, lost income and disability, and punitive damages. Plaintiff is informed and believes and further alleges that he will require future medical and/or hospital care, attention, and services.

**WHEREFORE**, Plaintiff demands judgment against Defendants for compensatory, treble and punitive damages, together with interest, costs of suit, attorneys' fees and all such other relief as the Court deems proper.

**COUNT IV**
**<u>BREACH OF IMPLIED WARRANTY</u>**
**<u>(AGAINST ALL DEFENDANTS)</u>**

287. Plaintiff incorporates by reference each preceding and succeeding paragraph as though set forth fully at length herein

288. At all relevant times, Defendants designed, researched, manufactured, tested, advertised, promoted, marketed, sold, and/or distributed the Trulicity that Plaintiff used.

289.    Trulicity was expected to and did reach the usual consumers, handlers, and persons encountering said products without substantial change in the condition in which it was produced, manufactured, sold, distributed, and marketed by the Defendants.

290.    At all relevant times, Defendants impliedly warranted to Plaintiff, Plaintiff's prescribing physicians, and the medical community that Trulicity was of merchantable quality and safe and fit for its ordinary purpose.

291.    At all relevant times, Defendants knew or should have known that Trulicity were unreasonably dangerous because of their increased risks of NAION and its sequelae, especially when the drug was used in the form and manner as provided by Defendants.

292.    At all relevant times, Defendants knew or should have known that Trulicity had not been sufficiently and/or adequately tested for safety.

293.    At the time Trulicity left Defendants' control, Trulicity did not conform to Defendants' implied warranties and was unfit for its ordinary purposes because Defendants failed to provide adequate warnings of the drug's causal association with increased risks of NAION and its sequelae.

294.    At all relevant times, Defendants reasonably anticipated and expected that prescribing physicians, such as Plaintiff's prescribing physicians, would recommend, prescribe and/or dispense Trulicity for use by their patients to improve glycemic control in adults with type 2 diabetes, to reduce cardiovascular risk, and/or to aid in chronic weight management.

295.    At all relevant times, Defendants reasonably anticipated and expected that individuals, such as Plaintiff, would use and/or consume Trulicity for its ordinary purpose.

296.    Despite the fact that Defendants knew or should have known that there was reasonable evidence of a causal association between Trulicity and unreasonably dangerous

68

injuries, such as NAION and its sequelae, Defendants continued to market, distribute, and/or sell Trulicity to consumers, including Plaintiff, without adequate warnings.

297. The unreasonably dangerous characteristics of Trulicity were beyond that which would be contemplated by the ordinary user, such as Plaintiff, with the ordinary knowledge common to the public as to the drugs' characteristics.

298. The unreasonably dangerous characteristics of Trulicity were beyond that which would be contemplated by Plaintiff's prescribing physicians, with the ordinary knowledge common to prescribing physician as to the drug's characteristics.

299. Plaintiff reasonably relied on Defendants' implied warranties of merchantability relating to Trulicity's safety and efficacy.

300. Plaintiff reasonably relied upon Defendants' skill and judgment as to whether Trulicity was of merchantable quality and safe and fit for its intended uses.

301. Upon information and belief, Plaintiff's prescribing physicians relied on Defendants' implied warranties of merchantability and fitness for the ordinary use and purpose relating to Trulicity.

302. Upon information and belief, Plaintiff's prescribing physicians, reasonably relied upon the skill and judgment of Defendants as to whether Trulicity was of merchantable quality and safe and fit for its intended use.

303. Had Defendants not made these implied warranties, Plaintiff would not have used Trulicity, and/or, upon information and belief, Plaintiff's prescribing physicians would not have prescribed Trulicity, and/or would have altered their prescribing practices and/or would have provided Plaintiff with adequate warnings regarding the dangers of Trulicity, to allow Plaintiff to make an informed decision regarding their use of Trulicity.

304.    Defendants herein breached the aforesaid implied warranties of merchantability because Trulicity was not fit for its intended purposes.

305.    Defendants' breaches of implied warranties of merchantability were a substantial factor in causing Plaintiff's injuries.

306.    As a direct and proximate result of one or more of the foregoing breaches, Plaintiff was caused to suffer serious and dangerous injuries, including NAION and its sequelae, which resulted in other severe and personal injuries which are permanent and lasting in nature, physical pain, and mental anguish, including diminished enjoyment of life, as well as the need for lifelong medical treatment, monitoring and/or medications, and fear of developing any of the above-named health consequences.

307.    As a direct and proximate result of one or more of the foregoing breaches, Plaintiff also suffered consequent economic and other losses, including pain and suffering, loss of a normal life, medical expenses, lost income and disability, and punitive damages. Plaintiff is informed and believes and further alleges that he will require future medical and/or hospital care, attention, and services.

**WHEREFORE**, Plaintiff demands judgment against Defendants for compensatory, treble and punitive damages, together with interest, costs of suit, attorneys' fees and all such other relief as the Court deems proper.

**COUNT V**
**FRAUDULENT CONCEALMENT/FRAUD BY OMISSION**
**(AGAINST ALL DEFENDANTS)**

308.    Plaintiff incorporates by reference each preceding and succeeding paragraph as though set forth fully at length herein.

309.    At all relevant times, Defendants designed, researched, manufactured, tested, advertised, promoted, marketed, sold, and distributed Trulicity, which was used by Plaintiff as hereinabove described.

310.    At all relevant times, Defendants knew or should have known that Trulicity had not been adequately and/or sufficiently tested for safety.

311.    At all relevant times, Defendants knew or should have known that Trulicity was unreasonably dangerous because of the increased risk of NAION and its sequelae, especially when the drug was used in the form and manner as provided by Defendants.

312.    Defendants had a duty to disclose material information about Trulicity to Plaintiff and Plaintiff's prescribing physician(s), namely that Trulicity is causally associated with increased risk of NAION and its sequelae, because Defendants have superior knowledge of the drug and its dangerous side effects, this material information is not readily available to Plaintiff or Plaintiff's prescribing physician(s) by reasonable inquiry, and Defendants knew or should have known that Plaintiff and Plaintiff's prescribing physician would act on the basis of mistaken knowledge.

313.    Nonetheless, Defendants consciously and deliberately withheld and concealed from Plaintiff's prescribing physician(s), Plaintiff, the medical and healthcare community, and the general public this material information.

314.    Defendants' promotional websites for Trulicity do not disclose that there is reasonable evidence of a causal association between Trulicity and increased risk of NAION and its sequelae.

315.    Defendants' omissions and concealment of material facts were made purposefully, willfully, wantonly, and/or recklessly in order to mislead and induce medical and healthcare providers, such as Plaintiff's prescribing physician(s), and patients, such as Plaintiff, to dispense,

71

provide, prescribe, accept, purchase, and/or consume Trulicity for treatment of type 2 diabetes and/or to promote weight loss.

316.   Defendants knew or should have known that Plaintiff's prescribing physician(s) would prescribe and Plaintiff would use Trulicity without the awareness of the risks of serious side effects, including NAION and its sequelae.

317.   Defendants knew that Plaintiff and Plaintiff's prescribing physicians (s) had no way to uncover the concealed information and determine the truth surrounding Trulicity, as set forth herein.

318.   Upon information and belief, Plaintiff's prescribing physician(s) justifiably relied on Defendants' material omissions when making the decision to dispense, provide, and prescribe Trulicity.

319.   Upon information and belief, had Plaintiff's prescribing physician(s) been warned of the increased risk of NAION and its sequelae causally associated with Trulicity, they would not have prescribed Trulicity and/or would have provided Plaintiff with adequate information regarding the increased risk of NAION and its sequelae causally associated with Trulicity to allow Plaintiff to make an informed decision regarding Plaintiff's use of Trulicity.

320.   Upon information and belief, had Plaintiff's prescribing physician(s) been told that Trulicity had not been sufficiently and/or adequately tested for safety risks, including NAION and its sequelae, they would not have prescribed Trulicity and/or would have provided Plaintiff with adequate warnings regarding the lack of sufficient and/or adequate testing of Trulicity to allow Plaintiff to make an informed decision regarding Plaintiff's use of Trulicity.

321.   Plaintiff justifiably relied on Defendants' material misrepresentations, including the omissions contained therein, when making the decision to purchase and/or consume Trulicity.

72

322.    Had Plaintiff been informed of the increased risks causally associated with Trulicity, Plaintiff would not have used Trulicity and/or suffered NAION and its sequelae.

323.    Defendants' fraudulent concealments were a substantial factor in causing Plaintiff's injuries.

324.    Plaintiff intends to plead all claims of product liability that are supported by their factual allegations and that exist under the statutes and common law of the state or states applicable to their claims, including any applicable state Product Liability Act.

325.    As a direct and proximate result of the above stated omissions as described herein, Plaintiff was caused to suffer serious and dangerous injuries, including NAION and its sequelae, which resulted in other severe and personal injuries which are permanent and lasting in nature, physical pain, and mental anguish, including diminished enjoyment of life, as well as the need for lifelong medical treatment, monitoring and/or medications, and fear of developing any of the above-named health consequences.

326.    As a result of the foregoing acts and omissions, Plaintiff requires and/or will require more health care and services and did incur medical, health, incidental, and related expenses. Plaintiff is informed and believes and further alleges that Plaintiff will require future medical and/or hospital care, attention, and services.

**WHEREFORE**, Plaintiff demands judgment against Defendants for compensatory, treble and punitive damages, together with interest, costs of suit, attorneys' fees and all such other relief as the Court deems proper.

## COUNT VI
## FRAUDULENT / INTENTIONAL MISREPRESENTATION
## (AGAINST ALL DEFENDANTS)

327.    Plaintiff incorporates by reference each preceding and succeeding paragraph as though set forth fully at length herein.

328. At all relevant times, Defendants designed, researched, manufactured, tested, advertised, promoted, marketed, sold, and distributed Trulicity, which was used by Plaintiff as hereinabove described.

329. At all relevant times, Defendants knew or should have known that Trulicity had not been adequately and/or sufficiently tested for safety.

330. At all relevant times, Defendants knew or should have known of the serious side effects of Trulicity, including NAION and its sequelae.

331. At all relevant times, Defendants knew or should have known that Trulicity was not safe to improve glycemic control in adults with type 2 diabetes, reduce cardiovascular risk in patients with type 2 diabetes, or promote weight loss, given its increased risk of NAION and its sequelae.

332. Nonetheless, Defendants made material misrepresentations to Plaintiff, Plaintiff's prescribing physician(s), the medical and healthcare community at large, and the general public regarding the safety and/or efficacy of Trulicity.

333. Defendants represented affirmatively and by omission on television advertisements, social media and other online advertisements, and on the labels of Trulicity that Trulicity was a safe and effective drug for treatment of adults with Type 2 diabetes, or for chronic weight management, despite being aware of increased risks of NAION and its sequelae causally associated with using Trulicity.

334. Defendants were aware or should have been aware that their representations were false or misleading, and knew that they were concealing and/or omitting material information from Plaintiff, Plaintiff's prescribing physician(s), the medical and healthcare community, and the general public.

335. Defendants' misrepresentations of material facts were made purposefully, willfully, wantonly, and/or recklessly in order to mislead and induce medical and healthcare providers, such as Plaintiff's prescribing physician(s), and patients, such as Plaintiff, to dispense, provide, prescribe, accept, purchase, and/or consume Trulicity for treatment of type 2 diabetes and/or to promote weight loss.

336. Upon information and belief, Plaintiff's prescribing physician(s) had no way to determine the truth behind Defendants' false and/or misleading statements, concealments and omissions surrounding Trulicity, and reasonably relied on false and/or misleading facts and information disseminated by Defendants, which included Defendants' omissions of material facts in which Plaintiff's prescribing physician(s) had no way to know were omitted.

337. Upon information and belief, Plaintiff's prescribing physician(s) justifiably relied on Defendants' material misrepresentations, including the omissions contained therein, when making the decision to prescribe Trulicity to Plaintiff.

338. Upon information and belief, had Plaintiff's prescribing physician(s) been informed of the increased risk of NAION and its sequelae causally associated with Trulicity, Plaintiff's prescribing physician(s) would not have prescribed Trulicity and/or would have provided Plaintiff with adequate information regarding safety of Trulicity to allow Plaintiff to make an informed decision regarding Plaintiff's use of Trulicity.

## COUNT VII
## NEGLIGENT MISREPRESENTATION / MARKETING
## (AGAINST ALL DEFENDANTS)

339. Plaintiff incorporates by reference each preceding and succeeding paragraph as though set forth fully at length herein.

340. At all relevant times, Defendants negligently provided Plaintiff, Plaintiff's healthcare providers, the general medical community, and the public with false, fraudulent, and/or

incorrect information or omitted or failed to disclose material information concerning Trulicity, including, but not limited to, misrepresentations and marketing regarding the safety and known risks of Trulicity.

341.    At all relevant times, Defendants negligently provided Plaintiff, Plaintiff's healthcare providers, the general medical community, and the public with false, fraudulent, and/or incorrect information or omitted or failed to disclose material information concerning Trulicity, including, but not limited to, misrepresentations and marketing regarding the long-term effects of Trulicity.

342.    The information distributed by Defendants to the public, the medical community, Plaintiff and Plaintiff's prescribing physicians, including advertising campaigns, labeling materials, print advertisements, commercial media, and marketing was false and misleading and contained omissions and concealment of truth about the dangers of Trulicity.

343.    Defendants' conduct had the capacity to deceive and/or its purpose in making these misrepresentations was to deceive and defraud the public and the medical community, including Plaintiff and Plaintiff's health care providers; to falsely assure them of the quality of Trulicity and induce the public and medical community, including Plaintiff and Plaintiff's healthcare providers to request, recommend, purchase, and prescribe Trulicity.

344.    Defendants had a duty to accurately and truthfully represent and market to the medical and healthcare community, medical pharmaceutical manufacturers, Plaintiff, Plaintiff's healthcare providers and the public, the known risks of Trulicity, including its propensity to cause NAION and its sequelae.

345.    Defendants made continued omissions in Trulicity's labeling, including promoting it as safe and effective while failing to warn of its propensity to cause NAION and its sequelae.

76

346. Defendants made additional misrepresentations beyond the product labeling by representing Trulicity as s safe and effective treatment for diabetes with only minimal risks.

347. Defendants misrepresented and overstated the benefits of Trulicity to Plaintiff, Plaintiff's prescribing physicians, and the medical community without properly advising of the known risks to patients.

348. Defendants made the misrepresentations alleged herein with the intent to induce consumers, like Plaintiff, to take their diabetes treatment product.

349. In reliance upon the false, deceptive and negligent misrepresentations and omissions and marketing made by Defendants, Plaintiff and Plaintiff's healthcare providers were induced to, and did use and prescribe Trulicity, and relied upon the affirmative misrepresentations and/or negligent omissions in doing so.

350. As a direct and proximate result of the foregoing negligent misrepresentations and marketing and conduct with capacity to deceive and/or intention to deceive, Plaintiff suffered serious and ongoing injuries.

351. As a direct and proximate result of the foregoing misrepresentations, marketing, and deceitful intentions, Plaintiff requires and/or will require more healthcare and services and did incur medical, health, incidental, and related expenses.

352. Defendants knew or should have known that Plaintiff, Plaintiff's healthcare providers, and the general medical community did not have the ability to determine the true material facts which were intentionally and/or negligently concealed and misrepresented by Defendants.

353. Plaintiff and his healthcare providers would not have used or prescribed Trulicity had the true facts not been concealed by Defendants.

354.    Defendants had sole access to many of the material facts concerning the defective nature of Trulicity and its propensity to cause serious and dangerous side effects.

355.    At the time Plaintiff was prescribed and administered Trulicity, Plaintiff and Plaintiff's healthcare providers were unaware of Defendants' negligent misrepresentations and omissions.

356.    Defendants failed to exercise ordinary care in making representations concerning Trulicity while they were involved in the manufacture, design, sale, testing, quality assurance, quality control, promotion, marketing, labeling, and distribution in interstate commerce, because Defendants negligently misrepresented Trulicity's high risk of unreasonable and dangerous adverse side effects.

357.    Plaintiff and Plaintiff's healthcare providers reasonably relied upon the misrepresentations and omissions made by Defendants, where they concealed and misrepresented facts that were critical to understanding the true and full dangers inherent in the use of Trulicity

358.    Plaintiff and Plaintiff's healthcare providers' reliance on the foregoing misrepresentations and omissions was the direct and proximate cause of Plaintiff's injuries.

**WHEREFORE**, Plaintiff demands judgment against Defendants for compensatory, treble and punitive damages, together with interest, costs of suit, attorneys' fees and all such other relief as the Court deems proper.

**COUNT VIII**
**STRICT PRODUCT LIABILITY MISREPRESENTATION / MARKETING**
**(AGAINST ALL DEFENDANTS)**

359.    Plaintiff incorporates by reference each preceding and succeeding paragraph as though set forth fully at length herein.

78

360. State law imposes a duty on producers, manufacturers, distributors, lessors, and sellers of a product to exercise all reasonable care when marketing, promoting, distributing, and selling their products.

361. At all relevant times, Defendants designed, researched, manufactured, tested, advertised, promoted, marketed, sold, and distributed the Trulicity which was used by Plaintiff as hereinabove described.

362. Defendants made material misrepresentations to Plaintiff, Plaintiff's prescribing physicians, the medical and healthcare community at large, and the general public regarding the safety and/or efficacy of Trulicity.

363. Defendants represented affirmatively and by omission on advertisements and on the labels of Trulicity that Trulicity was a safe and effective drug for treatment of adults with type 2 diabetes, to aid in chronic weight management, and to reduce cardiac risk, despite the increased risks of NAION and its sequelae causally associated with using Trulicity.

364. Defendants' representations were false or misleading and/or concealing and/or omitting material information from Plaintiff, Plaintiff's prescribing physicians, the medical and healthcare community, and the general public.

365. Plaintiff and Plaintiff's prescribing physicians had no way to determine the truth behind Defendants' misrepresentations and concealments surrounding Trulicity, as set forth herein.

366. Upon information and belief, Plaintiff's prescribing physicians justifiably relied on Defendants' material misrepresentations, including the omissions contained therein, when making the decision to prescribe Defendants' Trulicity to Plaintiff.

367.    Upon information and belief, had Plaintiff's prescribing physicians been warned of the increased risks of NAION and its sequelae causally associated with Trulicity, Plaintiff's prescribing physicians would not have prescribed Trulicity and/or would have provided Plaintiff with adequate information regarding safety of Trulicity to allow Plaintiff to make an informed decision regarding his use of Trulicity.

368.    Upon information and belief, had Plaintiff's prescribing physicians been told that Trulicity had not been sufficiently and/or adequately tested for safety risks, including NAION and its sequelae, they would not have prescribed Trulicity and/or would have provided Plaintiff with adequate warnings regarding the lack of sufficient and/or adequate testing of Trulicity so that Plaintiff could make an informed decision regarding their use of Trulicity.

369.    Plaintiff reasonably relied on the false and/or misleading facts and information disseminated by Defendants, which included Defendants' omissions of material facts which Plaintiff had no way to know were omitted.

370.    Had Plaintiff been told of the increased risks of NAION and its sequelae causally associated with Trulicity, Plaintiff would not have used Trulicity and/or suffered from NAION and its sequelae.

371.    As a direct and proximate result of one or more the foregoing false representations and/or omissions, Plaintiff was caused to suffer serious and dangerous injuries including NAION and its sequelae, which resulted in other severe and personal injuries which are permanent and lasting in nature, physical pain, and mental anguish, including diminished enjoyment of life, as well as the need for lifelong medical treatment, monitoring and/or medications, and fear of developing any of the above-named health consequences.

372.    As a direct and proximate result of one or more of the foregoing false representations and/or omissions, Plaintiff had also suffered consequent economic and other losses, including pain and suffering, loss of a normal life, medical expenses, lost income and disability, and punitive damages. Plaintiff is informed and believes and further alleges that he will require future medical and/or hospital care, attention, and services.

**WHEREFORE**, Plaintiff demands judgment against Defendants for compensatory, treble and punitive damages, together with interest, costs of suit, attorneys' fees and all such other relief as the Court deems proper.

**COUNT IX**
**NEGLIGENT DESIGN**
**(AGAINST ALL DEFENDANTS)**

373.    Plaintiff incorporates by reference each preceding and succeeding paragraph as though set forth fully at length herein.

374.    Defendants are liable to Plaintiff for the injuries and damages sustained due to Defendants' negligent design and/or formulation of Trulicity.

375.    At all relevant times, Defendants owed a duty to consumers, including Plaintiff and Plaintiff's health care providers, to assess, manage, and communicate the risks, dangers, and adverse effects of Trulicity. Defendants' duties included, but were not limited to, carefully and properly designing, testing, studying, and manufacturing Trulicity.

376.    Defendants negligently and carelessly breached the above-described duties to Plaintiff by, among other acts and omissions, negligently and carelessly:

   a. Failing to use ordinary care in designing, testing, and manufacturing Trulicity;

   b. Failing to design Trulicity as to properly minimize the adverse effects to the eyes and optic nerve;

   c. Failing to counteract in the design the known adverse effects on the eyes and optic nerve;

81

    d. Designing a product where the benefits was greatly outweighed by the risks, including NAION and its sequelae; and

    e. Designing a product without taking into consideration the proper dosage that could avoid NAION and its sequelae.

377. Trulicity was defective in design or formulation in that, when it left the hands of the manufacturers and/or suppliers and/or distributors, the foreseeable risks exceeded the benefits associated with the design or formulation.

378. At all relevant times, given its lack of efficacy and increased safety risks, Trulicity did not meet the reasonable expectations of an ordinary consumer, particularly the Plaintiff, or in the alternative, Plaintiff's medical providers.

379. Trulicity was defective in design or formulation in that, when it left the hands of the manufacturers and/or suppliers and/or distributors, it was unreasonably dangerous, more dangerous than an ordinary consumer would expect, and more dangerous than other similar drugs.

380. Despite Defendants' knowledge of the foreseeable risks and unreasonably dangerous nature of Trulicity, at all relevant times, Defendants designed and brought the product to market and continued to market the drug when there were safer alternatives available, including but not limited to alternate dosing and reduced exposure.

381. Plaintiff intends to plead all claims of product liability that are supported by his factual allegations and that exist under the statutes and common law of the state or states applicable to their claims, including any applicable state Product Liability Act.

382. As a direct and proximate result of one or more of the foregoing negligent acts and omissions by Defendants, Plaintiff was caused to suffer serious and dangerous injuries including NAION and its sequelae, which resulted in other severe and personal injuries which are permanent and lasting in nature, physical pain, and mental anguish, including diminished enjoyment of life,

as well as the need for lifelong medical treatment, monitoring and/or medications, and fear of developing any of the above-named health consequences.

383.    As a direct and proximate result of one or more of the foregoing negligent acts and omissions by Defendants, Plaintiff has also suffered consequent economic and other losses, including pain and suffering, loss of a normal life, medical expenses, lost income and disability, and punitive damages. Plaintiff is informed and believes and further alleges that he will require future medical and/or hospital care, attention, and services.

**WHEREFORE**, Plaintiff demands judgment against Defendants for compensatory, treble and punitive damages, together with interest, costs of suit, attorneys' fees and all such other relief as the Court deems proper.

**COUNT X**
**STRICT LIABILITY DESIGN DEFECT**
**(AGAINST ALL DEFENDANTS)**

384.    Plaintiff incorporates by reference each preceding and succeeding paragraph as though set forth fully at length herein.

385.    Plaintiff is in the class of persons that Defendants should reasonably foresee as being subject to the harm caused by defectively designed Trulicity insofar as Plaintiff was the type of persons for whom Trulicity was intended to be used.

386.    At all times mentioned herein, Defendants designed, researched, manufactured, tested, advertised, promoted, marketed, sold and/or distributed the Trulicity that was used by Plaintiff.

387.    Defendants, which are engaged in the business of designing, researching, manufacturing, testing, advertising, promoting, marketing, selling and/or distributing the Trulicity that was used by Plaintiff, placed it into the stream of commerce in a defective and unreasonably

dangerous condition such that the foreseeable risks exceeded the benefits associated with the design and/or formulation of Trulicity.

388. The Trulicity supplied to Plaintiff was defective in design or formulation and unreasonably dangerous when it left the hands of Defendants, and it reached the users and consumers of the products, including Plaintiff, without substantial alteration in the condition in which it was sold.

389. Trulicity was defective in design or formulation in that:

 a. Defendants knew or should have known of the dangers associated with Trulicity, but failed to use ordinary care in designing, researching, manufacturing, testing, advertising, promoting, marketing, selling and/or distributing Trulicity;

 b. The benefits of Trulicity were greatly outweighed by the foreseeable risks associated with the design or formulation of Trulicity, including NAION and its sequelae;

 c. There was a safer, economically feasible alternative design or formulation for Trulicity that Defendants could have used;

 d. The design or formulation of Trulicity failed to properly minimize the known adverse effects to the gastrointestinal and immune systems;

 e. The design or formulation of Trulicity failed to counteract the known adverse effects on the gastrointestinal and immune systems; and

 f. The design or formulation of Trulicity failed to take into consideration the proper dosage that could avoid NAION and its sequelae.

390. At all relevant times, given its lack of efficacy and increased safety risks, Trulicity did not meet the reasonable expectations of an ordinary consumer, particularly Plaintiff, or in the alternative, Plaintiff's medical providers.

391. Trulicity was defective in design or formulation in that, when it left the hands of the manufacturers and/or suppliers and/or distributors, they were unreasonably dangerous, more dangerous than an ordinary consumer would expect, and more dangerous than other similar drugs.

392. Despite Defendants' knowledge of the foreseeable risks and unreasonably dangerous nature of Trulicity, at all relevant times, Defendants designed and brought the products to market and continued to market the drugs when there were safer alternatives available, including but not limited to alternate dosing and reduced exposure.

393. Plaintiff intends to plead all claims of product liability that are supported by their factual allegations and that exist under the statutes and common law of the state or states applicable to their claims, including any applicable state Product Liability Act.

394. As a direct and proximate result of one or more of the foregoing acts and omissions by Defendants, Plaintiff was caused to suffer serious and dangerous injuries including NAION and its sequelae, which resulted in other severe and personal injuries which are permanent and lasting in nature, physical pain, and mental anguish, including diminished enjoyment of life, as well as the need for lifelong medical treatment, monitoring and/or medications, and fear of developing any of the above-named health consequences.

395. As a direct and proximate result of one or more of the foregoing acts and omissions by Defendants, Plaintiff has also suffered consequent economic and other losses, including pain and suffering, loss of a normal life, medical expenses, lost income and disability, and punitive damages. Plaintiff is informed and believes and further alleges that they will require future medical and/or hospital care, attention, and services.

**WHEREFORE**, Plaintiff demands judgment against Defendants for compensatory, treble and punitive damages, together with interest, costs of suit, attorneys' fees and all such other relief as the Court deems proper.

## COUNT XI
## NEGLIGENCE
## (AGAINST ALL DEFENDANTS)

396. Plaintiff incorporates by reference each preceding and succeeding paragraph as though set forth fully at length herein.

397. Defendants, directly or indirectly, caused Trulicity to be sold, distributed, packaged, labeled, marketed, promoted, and used by Plaintiff. At all relevant times, Defendants registered, researched, manufactured, distributed, marketed, overpromoted, and sold Trulicity throughout the United States.

398. At all relevant times, Defendants had a duty to exercise reasonable care in the designing, researching, testing, manufacturing, marketing, supplying, promotion, advertising, packaging, labeling, sale and/or distribution of Trulicity, including the duty to take all reasonable steps necessary to manufacture, promote, and/or sell a product that did not cause users to suffer from unreasonable, dangerous side effects without an adequate warning—when used alone or in foreseeable combination with other drugs.

399. At all relevant times, Defendants knew, or in the exercise of reasonable care, should have known of the hazards and dangers associated with Trulicity, and specifically that use of this drug could cause NAION and its sequelae.

400. At all relevant times, Defendants knew, or in the exercise of reasonable care, should have known that there was reasonable evidence of a causal association with NAION and its sequelae, and that the use of Trulicity could cause Plaintiff's injuries, and thus, created a dangerous and unreasonable risk of injury to the users of this product that Defendants did not warn of.

401. Defendants knew, or in the exercise of reasonable care, should have known that users and consumers were unaware of the risks and magnitude of the risks associated with the use of Trulicity.

402.    Defendants breached their duty of care to Plaintiff and Plaintiff's treating physicians, in the warning, testing, monitoring, and pharmacovigilance of Trulicity.

403.    In disregard of their duties, Defendants committed one or more of the following negligent acts or omissions:

a. Manufacturing, producing, overpromoting, marketing, formulating, creating, developing, designing, selling, and distributing Trulicity, without thorough and adequate pre- and post-market testing of the product;

b. Manufacturing, producing, overpromoting, marketing, advertising, formulating, creating, developing, and distributing Trulicity, and upon information and belief, while negligently and intentionally concealing and failing to disclose clinical data which demonstrated the risks of serious harm associated with the use of Trulicity;

c. Failing to undertake sufficient studies and conduct necessary tests to determine whether or not Trulicity was safe for its intended uses;

d. Upon information and belief, failing to disclose and warn of the products' defects to the regulatory agencies, the medical community, and consumers that Defendants knew and had reason to know that Trulicity was indeed unreasonably unsafe and unfit for use by reason of the product's defects and risks of harm to its users;

e. Failing to warn Plaintiff, the medical and healthcare community, and consumers that Trulicity's risks of harm were unreasonable and that there were safer and effective alternative products available to Plaintiff and other consumers;

f. Failing to provide adequate instructions, guidelines, and safety precautions to those persons to whom it was reasonably foreseeable would use Trulicity;

g. Advertising, marketing, and recommending the use of Trulicity, while concealing and failing to disclose or warn of the dangers Defendants knew or should have known to be connected with, and inherent in, the use of Trulicity;

h. Representing that Trulicity was safe for weight management when in fact Defendants knew and/or should have known the product was not safe for those purposes;

i. Continuing to manufacture and sell Trulicity with the knowledge that Trulicity, when used for weight management, was unreasonably unsafe and dangerous;

j. Failing to use reasonable and prudent care in the design, research, testing, manufacture, and development of Trulicity so as to avoid the risks of serious harm associated with the use of Trulicity. Failing to design and manufacture

87

Trulicity so as to ensure the drug was at least as safe and effective as other similar products;

k. Failing to ensure that Trulicity was accompanied by proper and accurate warnings about the increased risks of NAION and its sequelae;

l. Failing to ensure that Trulicity was accompanied by proper and accurate warnings about possible adverse side effects associated with the use of Trulicity and that use of Trulicity created a high risk of severe and debilitating injuries; and

m. Failing to conduct adequate testing, including pre-clinical and clinical testing, and post-marketing surveillance to determine the safety of Trulicity.

404. A reasonable manufacturer, designer, distributor, promoter, or seller under the same or similar circumstances would not have engaged in the aforementioned acts and omissions.

405. As a direct and proximate result of Defendants' negligent testing, monitoring, and pharmacovigilance of Trulicity, Defendants introduced a drug into the State of West Virginia which they knew or should have known would cause serious, severe and debilitating injuries, including NAION and its sequelae.

406. The aforementioned negligence and wrongs done by Defendants were aggravated by the kind of grossly negligent conduct and disregard for the rights of others, the public, and Plaintiff, for which the law allows the imposition of exemplary or punitive damages, in that Defendants' conduct involved an extreme degree of risk, considering the probability and magnitude of the potential harm to others, and Defendants proceeded with a reckless disregard to the rights, safety, and welfare of others, including Plaintiff.

407. Defendants are liable in tort to Plaintiff for their wrongful conduct pursuant to applicable state law.

408. As a direct or proximate result of one or more of the foregoing negligent acts and omissions, Plaintiff was caused to suffer serious and dangerous injuries, which resulted in other severe and personal injuries which are permanent and lasting in nature, including physical pain,

88

mental anguish, diminished enjoyment of life, as well as the need for lifelong medical treatment, monitoring and/or medications, and fear of developing any of the above-named health consequences.

409.    As a direct and proximate result of one or more of the foregoing negligent acts and omissions by Defendants, Plaintiff suffered bodily injuries and consequent economic and other losses, including pain and suffering, loss of a normal life, medical expenses, lost income and disability, and punitive damages.

**WHEREFORE**, Plaintiff demands judgment against Defendants for compensatory, treble and punitive damages, together with interest, costs of suit, attorneys' fees and all such other relief as the Court deems proper.

## COUNT XII
## NEGLIGENT UNDERTAKING
## (AGAINST ALL DEFENDANTS)

410.    Plaintiff incorporates by reference each preceding and succeeding paragraph as though set forth fully at length herein.

411.    Numerous state laws recognize liability related to the voluntary assumption of a duty or undertaking. This includes the voluntary undertaking of targeting patients with direct-to-consumer ("DTC") marketing campaigns.

412.    Defendants voluntarily undertook the responsibility to market Trulicity directly to the consumer instead of solely to physicians and other health care providers. In choosing to target the ordinary consumer with their DTC marketing campaigns, the Defendants undertook the responsibility to do so in a truthful and non-misleading manner and to adequately warn of the risks of their product. Having undertaken the responsibility, Defendants are required to do so with reasonable care.

413. Courts have recognized that DTC advertising "provides the consumer with a diluted variation of risks associated with the drug product" and "[c]onsumers often interpret such warnings as a 'general reassurance' that their condition can be treated," rather than an awareness of risks. *See, e.g, Perez v. Wyeth Lab'ys Inc.,* 161 N.J. 1, 14, 734 A.2d 1245, 1253 (1999).

414. The FDA requires pharmaceutical promotional materials to be truthful and non-misleading and that they comply with applicable statutory and regulatory requirements. The FDA looks not just at specific risk-related statements, but at the net impression of promotional materials.

415. Common law requires a company to act with reasonable care when they assume a duty to the consumer.

416. As alleged above, Defendants failed to warn consumers in their DTC advertisements about the true nature and extent of the risks associated with Trulicity. This includes warnings as to the possibility of developing NAION and its sequelae, and the true efficacy of the drugs – primarily that most patients stop taking the drug and regain any weight that was lost. Only a small percentage of patients ever reach a normal BMI on weight loss drugs.

417. Instead, Defendants advertisements promoted happy images of individuals stating they would "lose weight and keep it off." This DTC campaign amassed over 13 million impressions in the first 3 days after launch.

418. Novo does not disclose the need to remain on its weight loss drugs forever in order to maintain weight loss in its direct-to-consumer marketing campaigns. Nor does Novo disclose that everyone is at risk of regaining all the weight back within five years.

419. If this information had been disclosed to Plaintiff, then they would not have sought a prescription for Trulicity.

420.    As a direct and proximate result of Defendant's breach of duty of care, Plaintiff suffered mental and physical injuries from taking Trulicity.

421.    Defendants are liable in tort to Plaintiff for their wrongful conduct pursuant to applicable state law.

422.    As a direct and proximate result of these negligent acts and omissions by Defendants, Plaintiff suffered bodily injuries and consequent economic and other losses, including pain and suffering, loss of a normal life, medical expenses, lost income and disability, and punitive damages.

**WHEREFORE**, Plaintiff demands judgment against Defendants for compensatory, treble and punitive damages, together with interest, costs of suit, attorneys' fees and all such other relief as the Court deems proper.

<u>**PRAYER FOR RELIEF**</u>

WHEREFORE, Plaintiff demands judgment against Defendants on each of the above referenced claims and causes of action, jointly and severally, awarding:

(a) Compensatory damages in excess of $75,000, including, but not limited to pain, suffering, discomfort, physical impairment, emotional distress, loss of enjoyment of life, and other noneconomic damages in an amount to be determined at trial of this action;

(b) Economic damages in the form of medical expenses, out of pocket expenses, lost earnings and other economic damages in an amount to be determined at trial of this action;

(c) Punitive and/or exemplary damages for the wanton, willful, fraudulent, reckless acts of the Defendants who demonstrated a complete disregard and reckless indifference for the safety and welfare of the general public and Plaintiff in an amount sufficient to punish Defendants and deter future similar conduct;

(d) Pre-judgment interest;

(e) Post-judgment interest;

(f) Reasonable attorneys' fees;

(g) The costs of these proceedings; and

(h) Such other and further relief as this Court deems just and proper.

## **JURY DEMAND**

TAKE NOTE that Plaintiff demands trial by jury as to all issues herein.


Dated: July 29, 2026

RESPECTFULLY SUBMITTED,
*/s/ Parvin K. Aminolroaya*
Parvin K. Aminolroaya (Bar #028492008)
SEEGER WEISS LLP
55 Challenger Rd., 6th Floor
Ridgefield Park, NJ 07660
Phone: (973) 639-9100
paminolroaya@seegerweiss.com
*Attorney for Plaintiff*